**STATE of Missouri, Respondent,**

v.

**Joel Lee MASSLON, Appellant.**

**No. 53170.**

Missouri Court of Appeals,
Eastern District,
Division Four.

March 1, 1988.

William L. Webster, Atty. Gen., Karen A. King, Asst. Atty. Gen., Jefferson City, for respondent.

Robert Wolfrum, Asst. Public Defender, St. Charles, for appellant.

SIMON, Presiding Judge.

Defendant, Joel Lee Masslon, was charged with two counts of involuntary manslaughter and one count of driving without a valid operator's license. Trial was before a jury in the Circuit Court of St. Charles County. The jury found defendant guilty as charged. Defendant was sentenced to two consecutive seven year

terms of imprisonment on the involuntary manslaughter charges and to a ninety day term of imprisonment for driving without a valid operator's license to run concurrently with the manslaughter sentences.

On appeal defendant claims that the trial court erred: (1) in refusing to allow defendant to present testimony concerning the bias, credibility and partiality of Gerald Thompson, a witness for the state; (2) in overruling defendant's objection to hearsay testimony; (3) in overruling defendant's motions for judgment of acquittal because the facts and circumstances proved by the state were not consistent with each other and the guilt of defendant; and (4) in refusing to declare a mistrial after the state elicited testimony to the effect that defendant had refused to make a statement. We reverse and remand.

Viewed in the light most favorable to the verdict, the evidence adduced at trial showed the following: On January 8, 1986, at approximately 6:30 p.m., a red Mazda automobile was observed by Gerald Thompson traveling on Highway T, a two lane road, near its junction with Highway D. The red automobile approached the vehicle driven by Thompson from the rear at an extremely high rate of speed. Thompson testified that the red car was traveling above the speed limit and was weaving back and forth across the center line. Thompson testified that the Mazda tailgated his vehicle for approximately one minute, passed on his left hand side, and then cut in front rather abruptly. As the car passed, Thompson observed, from a "quick peripheral view," only one person in the vehicle. Thompson stated that the person was of a large to medium build and did not have a hat on. On cross-examination, Thompson testified that after the car had passed he could see the silhouette of a person in the driver's seat but no passenger. He testified, however, that he could not see through the passenger seat.

Thompson eventually lost sight of defendant's automobile after it had turned onto Highway D. However, as Thompson approached New Melle, Missouri, he came upon an automobile accident involving the red Mazda and a silver compact. The front end of the silver compact was "mangled" and the red Mazda "was stuck into the side of it perpendicular to the roadway." Thompson estimated that he arrived at the scene approximately 45 seconds to one minute after the accident occurred, as steam was coming from the silver compact's radiator. Thompson testified that the two car doors that he could see, the driver's door on the silver compact and the passenger door on the red Mazda, were closed and that he saw no one on the street near the scene of the accident, or in the vehicles. Realizing that the accident was serious, Thompson went to call for help.

Daniel Almeling, of the New Melle Fire Department, responded to the call. After initially surveying the situation, he went to the red Mazda and looked through the "rolled up window" on the driver's side. He saw defendant "slumped" across the passenger seat, with his head lying out the shattered passenger window. Defendant's right foot was laying on the floorboard and his left foot was laying across the console separating the passenger seat from the driver's seat. Almeling then went to the other car involved in the accident. The driver had no pulse. The passenger was semiconscious. She died at the hospital at 8:02 p.m. that evening.

Almeling testified that he entered defendant's vehicle through the driver's door. Almeling testified that the door was stuck and that he had to "yank on the driver's door very hard to get it open." Almeling testified that forcing the door open had "sprung" the catch mechanism and that it would not close freely afterwards. Almeling noticed that the stickshift mounted in the console of the car had been broken; that the inside of the passenger door was "smashed," as if something had hit it from the side; and that the rearview mirror was found in the passenger seat after defendant was extricated from the car. Almeling testified that there was blood splattered across the outside of the windshield, extending from near the passenger window across the front. A cap was found outside of the vehicles, later identified by defendant's wife as belonging to defendant.

Beer bottles and cans were found "all over the backseat" of defendant's car. Melissa Williams, a paramedic from the New Melle Fire Department who was also on the scene, testified that she noticed a "strong smell" of alcohol on defendant's breath. Williams testified at trial that, at the scene, defendant stated that he had had two or three beers, but when she told him that medication was going to be administered, defendant stated he had had eight to nine beers. At the preliminary hearing Williams testified that defendant stated he had had eight or nine beers when first questioned and had not changed his story. Richard Arnold, a paramedic on the scene, also testified that he noticed the strong smell of alcohol on defendant's breath and that defendant appeared intoxicated.

At the preliminary hearing Melissa Williams testified that she had opened the driver's door of defendant's car without any trouble. However, at trial she testified that she was present when Almeling opened the door and that her earlier statement was incorrect. Williams also testified, both at the preliminary hearing and at trial, that no part of defendant's body was laying across the console of the vehicle.

As standard procedure, defendant was asked whether he was alone in the vehicle. Defendant responded that he had not been alone, but that a man named Mark had been driving. Defendant told Highway Patrolman Robert Mallery that he had met a man named Mark outside a tavern in Union, Missouri. Defendant told Mallery that he had had too much to drink and that Mark had agreed to drive. A search of the area surrounding the accident, including ditches, fields and wooded areas was conducted based on defendant's claim. The search lasted approximately five hours. No evidence of any kind was found to indicate that there had been a second person in defendant's car. Mallery testified, over defendant's hearsay objection, that he had checked eight hospitals in the area to see if anyone had been admitted with injuries between forty-five and fifty minutes after the accident and that no one had been admitted.

Approximately two weeks after the accident, defendant assisted Patrolman Mallery in a sketch of the alleged driver, whose likeness strongly resembled Jim Grimes, a local school principal who had been at the scene of the accident. Testimony at trial indicated that Grimes could not have been in defendant's car at the time of the accident.

Officer Larry Byndom testified that he had contacted defendant in the emergency room on the evening of the accident for the purpose of obtaining a statement about the circumstances of the accident. Officer Byndom testified that defendant "said he didn't want to make a statement." Defendant moved for a mistrial on the grounds that his right to remain silent and right against self-incrimination had been violated. The trial court denied the motion. The prosecution then asked Officer Byndom if he had sought a statement from defendant a second time after defendant initially refused. Defendant objected on the same grounds and was overruled. Officer Byndom testified that he asked again and defendant "said he did not wish to make a statement at all." At the conclusion of the state's direct examination of Officer Byndom, counsel approached the bench. Defense counsel interposed an additional objection to Officer Byndom's testimony based on the fact that the defendant's refusal to make a statement had not been provided to defendant pursuant to his discovery requests. Following a discussion in chambers with counsel, the trial court admonished the jury to disregard the testimony of Officer Byndom with respect to defendant's refusal to make a statement and said testimony was ordered stricken from the record as a sanction for the state's failure to comply with defendant's discovery request.

Following the testimony of the state's first witness, Gerald Thompson, the court adjourned for a noon recess. The court reconvened in chambers at the request of the defense. Defendant moved in the alternative for a dismissal or mistrial for a violation of the witness exclusion rule. Apparently, both the state's and defendant's witnesses had been instructed by the trial

court not to talk to any other witnesses and had been excluded from the courtroom during the testimony of other witnesses. Defendant presented the testimony of Kathleen Masslon, his wife, in support of his motion. She testified that she had been excluded from the courtroom as a witness and that following the noon recess she observed Gerald Thompson speaking to three other state witnesses that had been excluded, one of whom she identified as Melissa Williams. Mrs. Masslon testified further that Thompson came out of the courtroom and he said:

It wasn't that bad. He said: I remembered everything; it was a snap. He said—he said: And you know what—he said: You know what they kept asking? They kept talking about that hat. And then he said—and at that point I said to him: You're not—you're not allowed to talk about it.

And they kind of just—he just kind of laid back, like real smart-like, and said—and Melissa Williams said: Well, I know what he knows.

Q Did you hear him say anything else?

MRS. MASSLON: And then he said: They also wanted—they also kept asking me if I could see through the seats.

Q Okay.

MRS. MASSLON: And I couldn't hear anything else, because the jurors came out.

The trial court overruled defendant's motions, but again asked the state and defense to instruct the witnesses not to discuss the trial.

Mrs. Masslon testified for the defense. Defendant attempted to elicit testimony from her about the actions of Gerald Thompson following his testimony. The state made a general objection to this testimony which was sustained by the trial court without specifying the reason for its ruling. However, the trial court accepted the in chambers testimony of Mrs. Masslon as defendant's offer of proof of evidence tending to show Thompson's bias. Defendant did not attempt to recall Thompson and cross-examine him concerning his conduct

immediately following his testimony or cross-examine Melissa Thompson concerning the incident.

Defendant's first point on appeal is that the trial court erred in refusing to allow Mrs. Masslon to testify as to the improper communications by Gerald Thompson, following his testimony, to other state witnesses excluded from the courtroom because said testimony was relevant and admissible to show Thompson's bias, credibility and partiality, and to show that the testimony of Melissa Thompson was affected by the communications. Defendant does not contend that the trial court erred in failing to declare a mistrial because Thompson communicated with other excluded state witnesses in violation of the order of the trial court.

■ At the outset we note that no order of the trial court as to the exclusion of witnesses from the courtroom or any prohibition on communications appears in the record. We may not ordinarily notice or determine what was done in the trial court on the basis of statements contained in a brief which are not supported by the record. *State v. Parker*, 738 S.W.2d 566, 571 (Mo.App.1987). However, if the adversary counsel concedes in his or her brief that which has been omitted from the record, we may consider it as though it were contained therein. *Id.* at 572. Here, the state, in its brief, attacks defendant's first point on its merits. No assertion is made by the state that the witnesses were not excluded from the trial or were not told that communication among themselves was prohibited. Rather, the state contends that the trial court did not err in refusing to allow Mrs. Masslon to testify as to the statements made by Gerald Thompson to excluded witnesses because said statements did not show bias and were not an attempt to influence the other witnesses. Implicit in the state's contention is that the trial court excluded the witnesses and they were not to speak to each other about their testimony. Moreover, following the colloquy in chambers on the matter, the trial court instructed counsel "again" to instruct their witnesses not to speak to each other.

Thus, on review we shall consider that the witnesses were excluded.

■ For the purpose of affecting the credibility of a witness, it is always competent to show the feeling of a witness for or against a party litigant and his bias or prejudice if such there be. *State v. Darling*, 202 Mo. 150, 100 S.W. 631, 636–37 (1907). A witness may be interrogated as to attempts on his part to communicate with or influence other witnesses for purposes of impeachment for interest and bias. Also, independent evidence may be shown for the purpose of impeachment on this basis. *Strahl v. Turner*, 310 S.W.2d 833, 844 (Mo.1958). The trial court, of course, has considerable discretion as to the scope and extent of the inquiry into bias, but it cannot prevent it entirely. *State v. Ofield*, 635 S.W.2d 73, 75 (Mo.App.1982).

It is undisputed that defendant did not attempt to lay a foundation for the testimony of Mrs. Masslon by recalling Thompson and cross-examining him with respect to his actions immediately following his testimony when first called.

In *State v. Mooney*, 714 S.W.2d 216, 220 (Mo.App.1986), we stated:

> No foundation is required where the evidence of bias or prejudice of the adverse witness is conduct rather than prior utterances of the witness sought to be impeached. *State v. Beaver*, 621 S.W.2d 361, 363 (Mo.App.1981). It is always relevant to show the interest or bias of a witness, even though such evidence has no bearing on the issues of the case. *State v. Glass*, 554 S.W.2d 426, 429 (Mo. App.1977).
>
> [w]hen conduct is offered to show bias, an inference is being made. The inference is from the act or conduct, to the feelings inspiring it. The only question is whether from the conduct or language, a palpable and more or less fixed hostility (to one party) or sympathy (for the other) is inferable. Wigmore, Evidence § 950. This question is for the discretion of the trial court. *State v. Punshore*, 133 Mo. 44, 34 S.W. 25, 28 (Mo.1896). Wigmore, Evidence § 950. Absent a

clear abuse of discretion, we will not disturb the trial court's ruling.

*Mooney*, 714 S.W.2d at 220 (citation omitted).

The critical issue is whether Thompson's conduct so strongly gives rise to an inference of bias, that the denial by the trial court of interrogation into the matter constitutes an abuse of discretion. *Id.* The state argues that because Thompson's conduct can be "interpreted as merely the excited utterances of a novice witness, the fact that the trial court refused to admit the testimony is not an abuse of discretion."

In *Mooney*, the trial court refused to allow a defense witness to testify that the victim of a sexual assault threatened "to get her" for testifying against the victim. The defendant had offered the testimony for the purpose of impugning the victim's credibility. We ruled that because the victim's conduct could be interpreted as evidence of anger at the witness, as well as evidence of bias towards the defendant, it did not strongly indicate bias, and therefore the trial court had not abused its discretion.

■ In the instant case, we conclude that Thompson's conduct strongly indicated bias. Immediately after testifying, Thompson violated the order prohibiting communications between witnesses. He began talking with other state witnesses that had been excluded. He was told by defendant's wife that it was improper and to stop, but he only leered at her and continued. The only witness identified that Thompson spoke to was Melissa Williams, although two others, labled by the state as "medical personnel," were present. Thompson commented that he remembered everything; that "it was a snap." He told the witnesses about his cross-examination concerning whether defendant had been wearing a cap and whether he could see anyone else in defendant's car through a seat. This essentially gave the theory of defendant's defense to the other witnesses. A significant part of Melissa Williams' testimony and the testimony of the other "medical personnel" was to show that defendant had

been alone in the car and thus was the driver at the time of the accident. At the very least Melissa Williams and the other two unnamed witnesses were alerted by Thompson that there was an issue concerning the identity of defendant as the driver of the automobile. It appears that Thompson was trying to coordinate the testimony of the other witnesses. Moreover, it is not known what Thompson said to these witnesses after the jurors emerged from the courtroom because it prevented Mrs. Masslon from hearing anything further. To permit communications between excluded witnesses and a witness who has testified, as to his testimony, totally frustrates the purpose of the exclusion. The barring of Mrs. Masslon's testimony was a clear abuse of discretion and the cause must be reversed and remanded. Nevertheless, we shall review defendant's claim of submissibility, his third point, and then his remaining two points as they may recur on retrial.

In his third point, defendant claims that the trial court erred in overruling his motions for judgment of acquittal following all the evidence and after the verdict because the facts and circumstances proved were inconsistent with each other and the guilt of defendant, and inconsistent with a reasonable theory of his innocence.

■■■ The state concedes in its brief, and we agree, that defendant's conviction is based on circumstantial evidence.

> To support a conviction or make a submissible case based on circumstantial evidence, the facts and circumstances must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but also must be inconsistent with every other reasonable hypothesis of innocence.

*State v. Caldwell,* 698 S.W.2d 566, 573 (Mo.App.1985). In a case involving circumstantial evidence, the circumstances, however, need not be absolutely conclusive of guilt, and they need not demonstrate impossibility of innocence. *State v. Thomas,* 452 S.W.2d 160, 162 (Mo.1970). Moreover, the mere existence of other possible hypotheses is not enough to remove the case

from the jury. Without reciting the evidence again, we find that the circumstances as set out are consistent with each other and inconsistent with the hypothesis of defendant's innocence.

In his second point, defendant claims that the trial court erred in admitting the testimony of Highway Patrolman Robert Mallery. In an attempt to refute defendant's claim that someone other than defendant had been driving at the time of the accident, the state asked if Patrolman Mallery had checked with area hospitals to see if anyone had been admitted with injuries. Defense counsel asked to approach the bench and the following occurred:

> DEFENSE COUNSEL: I think this is something—this is something I want to bring up now, and not only to this question but to other questions. I suspect he's going to ask if—he's going to ask this man if he checked with certain hospitals and/or what he found. I mean, it's testimony based on hearsay; it violates the Defendant's right to confront and cross-examine witnesses against him. If the hospital told Officer Mallery that there wasn't anybody there, it's based on hearsay; it violates his right to confront and cross-examine witnesses against him under the Sixth Amendment to the United States Constitution and Fourteenth Amendment to the United States Constitution. He can't just ask him: Did you go here and check on this and did somebody tell you there was nobody there? He can't—he can't—

> PROSECUTOR:—I don't think it's hearsay. I think he can ask if anybody's in there with an injury and they can either say yes or no.

> DEFENSE COUNSEL: The case is State versus Chernick, C-h-e-r-n-i-c-k. It's hearsay, because he can't just ask him: Did you run down this lead and did you—did people tell you there was nothing to it or there was nobody there? He can't do that, Judge.

> PROSECUTOR: Well, he has a legitimate right to make an investigation to try to find out if there was another driv-

er and someone else injured. I think that shows what he did.

DEFENSE COUNSEL: If his answers are going to be based on what other people told him, that's hearsay and I can't cross-examine him on that.

THE COURT: Well, he can state whether or not he found anybody at any of these places who was injured or not injured from his investigation.

PROSECUTOR: That's all I'm asking.

DEFENSE COUNSEL: But, it's based on hearsay.

PROSECUTOR: I don't think it is.

THE COURT: Well, the Court's going to overrule to that extent. Now, I don't want you to get him to make statements as to hearsay statements as to what people actually said—

PROSECUTOR: Okay.

THE COURT:—just what he found.

Defense counsel was then allowed to conduct a voir dire examination of Mallery.

Q. Officer Mallery—

A. Yes.

Q. —you didn't—you didn't personally go to these hospitals or check them; is that correct?

A. No, sir.

Q. This is based on what other people told you over the phone or over the radio?

A. Yes, sir.

DEFENSE COUNSEL: Same objection.

THE COURT: Overruled, you may answer.

Mallery then testified that he had found no one who had come into the nearby hospitals "with any injuries at all."

■ Here, Patrolman Mallery testified that he had found no one who had come into the nearby hospitals with injuries near the time of the accident. The inference of hearsay, of course, was that he had been told by others that no one with injuries had been admitted to the hospitals. It is no less a violation of the hearsay rule to establish a set of circumstances by the testimony of a witness which invites an inference of hearsay. *State v. Valentine*, 646 S.W. 2d 729, 732 (Mo.1983).

■ Hearsay, however, is in-court testimony of an extrajudicial statement offered to prove the truth of the matters asserted therein. *State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981). It is well established that testimony offered to explain subsequent conduct, rather than to prove the truth of the facts testified to, is not inadmissible hearsay. *State v. Pettit*, 719 S.W. 2d 474, 476 (Mo.App.1986).

■ In the instant case, it does not appear from the record whether Patrolman Mallery's statement was offered to prove the truth of the matter or whether it was offered to show his subsequent conduct. However, because the state was attempting to show that defendant was the driver, it appears that the testimony came in to show its truth. Regardless, having discussed the propriety and impropriety of the testimony, we anticipate no further problems on retrial.

In his final point, defendant claims that the trial court erred in refusing to declare a mistrial after Officer Byndom testified that defendant had refused to make a statement because: (1) said refusal was not disclosed by the state in response to defendant's discovery request, and (2) admission of the testimony violated defendant's right against self-incrimination.

Addressing defendant's second claim first, we find it to be without merit. Citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), defendant argues that his Fifth and Fourteenth Amendment right against self-incrimination was violated because he was in custody at the time he refused to make a statement. Defendant maintains that being put on a stretcher, placed in an ambulance, taken to the hospital by St. Charles County Ambulance District paramedics, and that being attended to in the hospital emergency room was "the physical equivalent of custody."

In *Doyle*, the defendants were arrested and advised of their *Miranda* rights, but they elected to remain silent as to an exculpatory story. At separate trials, the prose-

cution sought to impeach the defendants with their post-arrest silence after the defendants first revealed the exculpatory story at trial. The United States Supreme Court held "that the use for impeachment purposes of [defendants'] silence, *at the time of arrest and after receiving Miranda warnings,* violated the Due Process Clause of the Fourteenth Amendment." *Doyle,* 96 S.Ct. at 2245. (emphasis supplied).

 *Doyle* is distinguishable from the instant case. Here, defendant was not under arrest and did not receive *Miranda* warnings at the time he was questioned. Indeed, at the time of the questioning, the police were searching for the alleged driver of defendant's car based on defendant's claim. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the United States Supreme Court ruled that where no governmental action induces a defendant to remain silent before arrest, such as the giving of *Miranda* warnings, "the impeachment by use of pre-arrest silence does not violate the Fourteenth Amendment" and is not fundamentally unfair. *Id.* at 2130. Defendant's constitutional claim is not well taken.

Turning to defendant's claim that a mistrial was in order because the state failed to disclose defendant's refusal to make a statement pursuant to defendant's request under Rule 25.03, we note that the issue has become moot. Defendant has been granted a new trial and is now aware of the defendant's statement.

Reversed and remanded.

CRANDALL and GRIMM, JJ., concur.