STATE of Missouri, Respondent,

v.

Douglas Robert STOLZMAN, Appellant.

No. 16777.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 31, 1990.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
Nov. 21, 1990.

Application to Transfer Denied
Jan. 9, 1991.

---

Michael Baker, Springfield, for appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found defendant Douglas Robert Stolzman guilty of possessing cocaine, § 195.020.1, RSMo 1986, a Schedule II controlled substance, § 195.017.4(1)(d), RSMo Supp.1987; *State v. Hutchens,* 604 S.W.2d 26, 27–28[3] (Mo.App.1980), and assessed punishment at three years' imprisonment. The trial court entered judgment per the verdict.

Defendant appeals, presenting three points relied on: (1) the evidence was insufficient to support the verdict, (2) the trial court erred in denying defendant's motion for mistrial after the arresting officer testified defendant made no response when asked whether the cocaine belonged to him, and (3) the cocaine should have been suppressed as evidence in that it was seized during a search to which defendant did not voluntarily consent.

In determining whether the evidence was sufficient to support the verdict we view the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Mc-*

*Donald,* 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi,* 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

So viewed, the evidence presented to the jury [1] established that about 12:40 p.m., February 9, 1988, Corporal Martin Kent Elmore of the Missouri State Highway Patrol was eastbound in a marked patrol car on U.S. Highway 60 near Willow Springs. He was following a Datsun 280–ZX bearing a Florida license plate.

The Datsun continued east on "the Willow Springs by-pass" until it reached the location where the bypass "merges with 60–63." There the Datsun made "an illegal lane change" by failing to signal.

Elmore stopped the Datsun. Defendant was the driver and sole occupant. Elmore asked defendant for his driver's license. Defendant produced a Florida driver's license bearing his name.

At Elmore's direction, defendant went to the patrol car and seated himself inside with Elmore.

Elmore asked defendant who owned the Datsun. Defendant replied he did not know. Defendant explained he "was driving the car to Florida for a bank and that the paperwork had somehow gotten messed up and that he didn't have a title."

Defendant showed Elmore a letter on the letterhead of First National Bank of Homestead, Florida. The letter was addressed to Springfield Nissan and pertained to a 1982 Datsun, identified by vehicle identification number. The letter referred to defendant

---

**1.** Evidence was also presented to the trial judge at a pretrial hearing on defendant's motion to suppress.

by name and stated: "This will serve as authorization for the above named person to pick up the above collateral on behalf of the First National Bank of Homestead." Defendant told Elmore he (defendant) had flown from Florida to Springfield where he picked up the Datsun.

Elmore "ran a computer check" on defendant's driver's license and the Datsun's license plate. Elmore testified: "I just wanted to know that [defendant] was not wanted and that his driver's license was valid. And I was also trying to determine the ownership of the car because [defendant] had told me that the car didn't belong to him." Elmore recounted that the State of Florida was slow to respond so he received no answer to his inquiry.

Elmore decided he needed to establish ownership of the Datsun so he asked defendant for permission to search it. Elmore testified, "... I explained to [defendant] that ... I would like to look in the car and that if he agreed for me to do that, that I needed a signed Consent form giving me permission to do that."

Elmore filled out a written consent form, handed it to defendant, told him to read it, and asked him to sign it. Defendant looked at the document, signed it, and returned it to Elmore.

Elmore instructed defendant to remain in the patrol car. Elmore went to the Datsun, opened the passenger door, looked in the glove box, and "found nothing ... in the way of any legal documents or nothing of any consequence."

A "console" was situated "between the bucket seats, just to the driver's right." A compartment in the console was covered by "a hinged type lid." Elmore estimated the compartment was a foot long, five to six inches wide, and six to eight inches deep. Elmore opened the compartment and looked inside "to see if there might be some documents in there."

The compartment held no documents but did contain: (1) a brown glass vial containing a white powdery substance, (2) a "flip top or hard pack" Marlboro cigarette box containing "some hand rolled cigarettes," (3) a steel bolt, (4) a cigarette lighter element that plugs into an automobile dashboard, and (5) four one-dollar bills. The power cord to a radar detector was plugged into the Datsun's cigarette lighter receptacle. The bottom of the Marlboro box displayed a "Florida tax stamp."

After observing the above items Elmore radioed "for a backup car." Sergeant Michael Weaver of the Missouri State Highway Patrol was dispatched to the scene. Upon arriving he was shown the items in the console compartment.

At trial the prosecutor asked Elmore what he did after showing the items to Weaver. Elmore testified, "Well I asked the defendant if the items belonged to him and at that point he didn't offer any kind of response at all." Defendant's lawyer immediately moved for a mistrial. The trial court denied the motion but instructed the jury to disregard the question and response. This incident is the subject of defendant's second point, discussed *infra*.

Elmore resumed his search of the Datsun. A suitcase was lying on the passenger seat. It contained clothing and four or five packs of Marlboro cigarettes of the "same hard flip top variety" as the pack in the console.

Elmore arrested defendant and advised him of his "Miranda rights."[2] Elmore then transported defendant to patrol headquarters at Willow Springs. Weaver remained with the Datsun until another officer arrived.

At headquarters Elmore telephoned Springfield Nissan and was informed by a service representative that defendant had picked up the Datsun there that day.

Weaver returned to headquarters and was asked by defendant whether he (defendant) "could have his four dollars ... out of the console." Weaver informed Elmore

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

of the request. Elmore returned the money to defendant.

A forensic chemist tested the substance in the vial and determined it was cocaine.

At trial Sergeant Weaver explained that the vial has a "ball valve" in the top. If the valve is turned it fills a chamber with a pre-measured amount of the substance in the vial. The valve can then be turned another direction, allowing the user to hold the vial to his nose "and sniff it as they drive down the road." Weaver testified that patrol personnel "see several of these from time to time."

Defendant, age 37 at time of trial, testified he had never been convicted of a felony and had never been arrested for one prior to the instant arrest. He stated that before this arrest his occupation was transporting repossessed automobiles for First National Bank of Homestead, Florida. Defendant recounted that about a month prior to the arrest he and another driver came to Springfield to pick up the Datsun and another vehicle. The Datsun was not drivable so it was towed to Springfield Nissan for repair.

Defendant returned to Springfield by plane February 9, 1988, arriving between 10:00 and 11:00 a.m. He went to Springfield Nissan, paid for the repairs, left a copy of the "release letter," and departed in the Datsun.

He drove to a gasoline station, filled the tank, and put in two quarts of oil. Upon paying for those items he received four dollars change which he put in the console compartment. Defendant denied he looked in the compartment at that time.

Defendant testified that when Elmore stopped him he had been in possession of the Datsun "an hour and a half, maybe two hours on the outside." Defendant recalled that neither Elmore nor Weaver was able to lock the Datsun on the roadside.

Defendant denied owning the vial and avowed he was unaware it was in the Datsun. He also denied knowledge of the Marlboro pack in the console. He asserted he did not search the Datsun when he entered it.

Defendant admitted his suitcase contained "Marlboro cigarettes with a hard carton, flip top type." Those cigarette packs bore Florida tax stamps, having been purchased there by him. Defendant also admitted ownership of the radar detector. He had plugged the device into the Datsun's cigarette lighter receptacle, and in doing so had removed the lighter element and placed it in the console compartment.

Defendant presented business records of Springfield Nissan pertaining to the Datsun. They included a repair order, two tow bills, and a stub from a $393.92 check.

Defendant's first point:

"The trial court erred in overruling [defendant's] motion for judgment of acquittal at the close of the State's evidence and at the close of all the evidence for the reason that there was not sufficient evidence presented from which to convict defendant ... of ... possession of cocaine."

■ Defendant moved for a judgment of acquittal at the close of the State's evidence. The motion was denied. As defendant thereafter presented evidence in his own behalf, he waived any claim of error regarding the denial of the motion, *State v. Green*, 476 S.W.2d 567, 569[2] (Mo.1972), hence we need consider only whether defendant's motion for judgment of acquittal at the close of all the evidence should have been granted. *State v. McQuerry*, 406 S.W.2d 624, 626[1] (Mo.1966).

■ Citing *State v. Falkner*, 672 S.W.2d 373, 374[1] (Mo.App.1984), defendant reminds us the State had to prove he was aware of the presence and character of the cocaine and was intentionally and consciously in possession of it. Additionally, as the evidence on those issues was circumstantial, the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they

must be inconsistent with innocence and exclude every reasonable hypothesis of innocence. *Id.* at 374[2].

Defendant emphasizes (1) the cocaine was found in the Datsun, not on his person, (2) he did not own the Datsun, (3) he had been in possession of the Datsun for at most two hours, (4) the Datsun had been in the possession of others—the owner, the repossessor, and Springfield Nissan—before defendant took possession, (5) the interior was easily accessible inasmuch as the doors could not be locked, and (6) nothing about defendant's behavior indicated he had been using drugs.

Defendant cites two cases where an accused was convicted of possessing a controlled substance found in an automobile and an appellate court reversed for evidentiary insufficiency. The first is *State v. West*, 559 S.W.2d 282 (Mo.App.1977). There the substance was found in a small box during a search of the trunk of a parked automobile owned—but not occupied—by the accused. There was evidence she had owned the automobile only about three weeks and her brother and her boyfriend both drove it. The brother testified he put a tire in the trunk two days before the search and did not see the box. There was no testimony that the accused had ever opened the trunk. The Eastern District of this Court pointed out there was no evidence the accused had exclusive control of the automobile and held that something more than mere ownership of a vehicle in which a controlled substance is discovered is required to support a conviction for possessing the substance. *Id.* at 285.

The second case defendant cites is *State v. Bowyer*, 693 S.W.2d 845 (Mo.App.1985). There an officer stopped an automobile driven by the accused and owned by his estranged wife. She occupied the front passenger seat. The officer found a marijuana cigarette in the console between the front seats. At trial the wife testified the accused had not been in the automobile for six months before the incident and was driving it that day only because he had to pick up a relative at a nearby village. The wife avowed her brother had brought the marijuana to her home several days earlier and she had put it in the automobile because of her three children at home. The accused, shortly after the arrest, had told the officer the marijuana belonged to the wife's brother. The Western District of this Court held the evidence proved conscious possession of the marijuana by the wife but not the accused. *Id.* at 849.

We have no quarrel with *West* or *Bowyer*. Neither, however, is factually close enough to the instant case to be controlling.

The instant case is factually closer to *State v. Ingleright*, 782 S.W.2d 147 (Mo.App.1990), and *State v. Ingleright*, 787 S.W.2d 826 (Mo.App.1990), two cases that arose from one incident. The accused was driving an automobile at excessive speed. He failed to stop when an officer signaled him to do so. He was apprehended by another officer in an adjoining county. The officer found marijuana seeds on the floor near the driver's seat and a plastic plate with the odor of marijuana smoke beneath the seat. The accused, the lone occupant, said the automobile belonged to a woman with whom he cohabited. In the trunk was a sack containing 40 hypodermic syringes. The sack was about twelve inches from a bag containing the accused's clothes. A console in the middle of the front seat contained a removable tray. Beneath the tray the officer found lysergic acid diethylamide, phenobarbital and marijuana. The accused was convicted of possessing drug paraphernalia (the syringes), 782 S.W.2d 147 (*"Ingleright I"*), and possessing the three substances in the console, 787 S.W.2d 826 (*"Ingleright II"*).

This Court affirmed both convictions, noting that the accused had been in exclusive possession of the automobile for some time (he resided in Michigan), he evaded the first effort to stop the automobile, the syringes were found in the trunk near his clothing thus permitting an inference he knew they were there, and the three con-

trolled substances in the console were within his reach. 782 S.W.2d at 149 and 787 S.W.2d at 829–30.

In the instant case defendant had been in exclusive possession of the Datsun an hour and a half to two hours and had driven it from Springfield to Willow Springs. He admitted putting the four dollars in the console compartment after buying gasoline and oil. He also admitted putting the cigarette lighter element in the console compartment when he plugged his radar detector into the lighter receptacle.

It is inferable that he also put the Marlboro pack in the compartment. He admitted the "flip top" packs of Marlboro cigarettes in the suitcase were his. The Marlboro pack in the compartment was the same type and, like the packs in the suitcase, bore a Florida tax stamp.

There was, therefore, direct evidence that defendant had put two items—the money and the lighter element—in the compartment (inferably at different times), and circumstantial evidence that he had put the Marlboro pack there.

There were only two other items in the compartment: the vial and the bolt. Corporal Elmore testified without contradiction that the vial and the Marlboro pack were "laying side by side, more or less," and that neither was concealed by anything. Given the small size of the compartment, it is inferable that the vial was readily visible, particularly as it was not beneath anything.

Furthermore, the vial was a device that allowed a driver to sniff a precise amount of cocaine as he drove. It was within easy reach of defendant—the driver and sole occupant.

The instant case is similar to both *Ingleright* cases in two respects. In each the automobile was owned by someone other than the driver, and in each the driver was the sole occupant.

The incriminating evidence in the instant case was stronger than that in *Ingleright II* in three respects. First, defendant here put items in the console compartment on two, and inferably three, occasions. There was no such evidence in *Ingleright II*. Second, the controlled substances in *Ingleright II* were beneath a tray in the console; here the vial was unconcealed and inferably visible to anyone opening the console compartment. Third, the vial here was a device a driver could use while operating the Datsun.

The incriminating evidence in the instant case was stronger than that in *Ingleright I* in that the vial in the instant case was readily visible in the console compartment where defendant had put items on two, and inferably three, occasions. In *Ingleright I* the syringes were in a sack in the trunk some twelve inches from a bag containing the accused's clothes. There was no indication in *Ingleright I* that the syringes could be seen without opening the sack.

The incriminating evidence in the *Ingleright* cases is stronger than that in the instant case in two respects. First, the accused in the *Ingleright* cases fled when the first officer signaled him to stop, while here defendant stopped on command. Second, the quantity of contraband in the *Ingleright* cases was greater than that in the instant case. We also note that the opinion in *Ingleright II* pointed out that the accused had a prior conviction for possession of marihuana. 787 S.W.2d at 829. That conviction was unmentioned, however, in *Ingleright I*, and was not relied on as circumstantial evidence of guilt in that opinion.

Measuring the evidence in the instant case against the *Ingleright* cases, we hold the circumstantial evidence that defendant in the instant case was aware of the presence and character of the cocaine and was intentionally and consciously in possession of it is at least as strong as the circumstantial evidence on those issues in the *Ingleright* cases. Defendant's first point is denied.

Defendant's second point, as noted earlier, asserts the trial court erred in denying

defendant's motion for mistrial when Elmore testified he asked defendant if the items in the console compartment belonged to him and defendant "didn't offer any kind of response at all." Defendant maintains this evidence constituted an impermissible comment on his right against self-incrimination guaranteed by the Fifth Amendment to the Constitution of the United States.

Defendant relies on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). There the prosecutor sought to impeach the accused's exculpatory story, told for the first time at trial, by cross-examining him about his failure to tell the story to law officers after receiving *Miranda* warnings at the time of arrest. The trial court overruled the accused's objections to the inquiry. The Supreme Court held it is a deprivation of due process to allow a prosecutor to use an arrestee's silence, after *Miranda* warnings, to impeach his testimony at trial. 426 U.S. at 618–19, 96 S.Ct. at 2245. In reversing the conviction the opinion noted the State of Ohio did not claim the cross-examination, in the circumstances of that case, might have been harmless error. 426 U.S. at 619–20, 96 S.Ct. at 2245.

The State maintains that if the incident related by Elmore occurred before defendant was arrested and advised of his *Miranda* rights, defendant's silence was admissible. As authority for that proposition the State cites *State v. Masslon,* 746 S.W.2d 618, 625–26 (Mo.App.1988). There an investigating officer testified he asked the accused about the circumstances of the incident under investigation (an automobile collision), and the accused responded that he did not want to make a statement. The accused's motion for mistrial was denied, and the Eastern District of this Court upheld the ruling on appeal. The Eastern District distinguished *Doyle* by pointing out that the accused in *Masslon* was not under arrest and had not received the *Miranda* warnings at the time the officer questioned him. *Masslon,* 746 S.W.2d at

626[11]. The Eastern District cited *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), for the premise that where no governmental action induces an accused to remain silent before arrest, such as the giving of *Miranda* warnings, the impeachment by use of pre-arrest silence does not violate the Fourteenth Amendment to the Constitution of the United States and is not fundamentally unfair. *Masslon,* 746 S.W.2d at 626.

In the instant case Elmore testified at the pretrial hearing on defendant's motion to suppress.[3] It is inferable from Elmore's testimony in that proceeding that he asked defendant about the items in the console a few minutes before telling defendant he was under arrest and administering the *Miranda* warnings. If that was the sequence of events, *Masslon* renders Elmore's testimony regarding defendant's silence admissible.

However, the State's brief concedes, "[I]t is unclear whether appellant's silence occurred before or after he was arrested." If the silence occurred after arrest and *Miranda* warnings, different principles apply.

Missouri condemned references by prosecutors to an accused's post-arrest silence prior to *Doyle. State v. Jones,* 532 S.W.2d 772, 774–75[2] (Mo.App.1975). Missouri cases have held, however, that a mistrial is not the inevitable remedy when such references are made. *State v. Borotz,* 654 S.W.2d 111, 113–15 (Mo.App.1983); *State v. Brooks,* 567 S.W.2d 348, 352–53 (Mo.App. 1978); *Jones,* 532 S.W.2d at 774–75[2].

▮ Factors to be considered include whether it was the accused or another witness who mentioned his silence, whether the accused refused or merely failed to make a statement, the degree of emphasis placed on that evidence, its repetition, defense objections thereto and relief requested, and the extent of relief granted by the trial court. *Borotz,* 654 S.W.2d at 114[2]; *Jones,* 532 S.W.2d at 774.

3. Footnote 1, *supra.*

In the instant case the prosecutor's question to Elmore did not appear calculated to elicit an answer recounting defendant's silence.[4] The trial court acted immediately, and though it denied a mistrial it instructed the jury to disregard the question and Elmore's response. The trial court was in a better position than us to evaluate the prejudice, if any, and the possibility of its removal by some action short of a mistrial. *Brooks,* 567 S.W.2d at 353[10]. Defendant's silence was unmentioned throughout the balance of the evidence and the prosecutor did not comment on it in final argument. In these circumstances we cannot convict the trial court of error in refusing to grant a mistrial. *Borotz,* 654 S.W.2d at 114–15; *Brooks,* 567 S.W.2d at 352–53; *Jones,* 532 S.W.2d at 774–75[2]. Defendant's second point is denied.

Defendant's third point maintains the trial court erred in denying defendant's motion to suppress the vial and the Marlboro pack found by Elmore in the console compartment. Defendant asserts: "[T]he stop and search of the Datsun ... by ... Elmore ... was without probable cause and was a pretextual stop; and ... the consent to search obtained by ... Elmore was coerced and not voluntarily given."

Defendant filed a pretrial motion to suppress the items taken by Elmore from the console compartment. Evidence at a hearing on that motion paralleled the evidence at trial. In addition, the evidence at the suppression hearing established that Elmore had followed the Datsun "three to five miles" before it changed lanes without signaling. Until then it had been driven properly.[5]

In support of his contention that Elmore's stop of the Datsun was pretextual, defendant points out that Elmore testified on cross-examination at trial that it is illegal to drive in the left lane of a divided four-lane highway unless the driver is passing another vehicle. Defendant argues this indicates Elmore was not sure why he stopped the Datsun and demonstrates that he wanted to search it because it bore a Florida license.

The State asserts that changing lanes without giving the appropriate signal violates § 304.019, RSMo 1986. That section provides in pertinent part: "No person shall ... move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein." In *Thomas v. Fitch,* 435 S.W.2d 703, 710[12] (Mo.App. 1968), this Court stated the requirement for an appropriate signal has been applied in cases involving movements on roadways where no intersecting highway was involved.

In *State v. Moody,* 443 S.W.2d 802 (Mo. 1969), two policemen followed an automobile and observed it was "zig-zagging, going over the dividing line." They stopped it and arrested the driver for "failure to keep to the right." They searched him and found a stimulant drug. The driver was convicted of possessing the drug. The Supreme Court of Missouri held the arrest, although for a traffic violation, was lawful. *Id.* at 804[4]. The opinion noted there was no evidence to support a contention that the arrest was pretextual.

That is likewise true in the instant case. The testimony of Corporal Elmore seized upon by defendant was in response to a question by defendant's lawyer about which lane a vehicle should be in if the driver is approaching the location where the bypass splits into Highways 60 and 63.

---

4. In this respect the instant case differs from *State v. Richardson,* 724 S.W.2d 311 (Mo.App. 1987).

5. Elmore also testified at the suppression hearing that the "hand rolled cigarettes" in the Marlboro pack in the console compartment "contained a substance that was not consistent with tobacco in texture ... I believed it to be marijuana." Elmore showed the vial to defendant and asked, "Is this cocaine?" Defendant replied, "Probably." The testimony in this footnote was not presented to the jury.

As we comprehend the transcript, the right lane at that location is for traffic to West Plains; the left lane is for traffic to Mountain View. Defendant had evidently been driving in the left lane, then moved to the right without signaling. That was when Elmore stopped him. According to Elmore, however, the maneuver occurred "quite some distance from the exit ... the exit is not even in view at that point." Read in context, Elmore's testimony fails to support defendant's contention that the stop was pretextual.

■ On the issue of consent, defendant cites *State v. Riefle*, 714 S.W.2d 604 (Mo. App.1986), which sets forth the well established rule that in relying on consent to justify the lawfulness of a search the State has the burden of proving the consent was in fact freely and voluntarily given. *Id.* at 605.

■ Whether a consent to search was voluntary or was the product of duress or coercion, express or implied, is to be determined from the totality of all the surrounding circumstances. *Id; State v. Reese*, 625 S.W.2d 130, 132 (Mo. banc 1981). In determining whether there was a voluntary consent to search, the court may consider such factors as the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in police custody, whether there was any fraud on the part of the officers, the acts and statements of the consenter, and any other matters comprising the totality of the circumstances. *Reese*, 625 S.W.2d at 132; *Riefle*, 714 S.W.2d at 605–06.

■ In the instant case Elmore was alone at the time defendant signed the written consent, Elmore had not displayed any weapon, Elmore had not arrested defendant, and Elmore had told defendant his (Elmore's) objective was to establish ownership of the Datsun.

Defendant testified at the suppression hearing that after he explained the facts to Elmore and showed him the "paperwork" from the bank, Elmore stated he did not feel defendant had the right to have the Datsun and defendant could not leave until Elmore could prove defendant's possession was lawful. Defendant confirmed that Elmore made a "radio call" which produced no information. Defendant testified he suggested that Elmore call the bank or Springfield Nissan but Elmore declined. Defendant conceded Elmore stated he wanted to search the Datsun "to prove ownership," and defendant's response was, "I've got nothing to hide, fine." Defendant avowed, however, that he signed the consent because he felt if he refused he would be in more trouble than he already was, and that he would be arrested "for a stolen vehicle."

■ The trial court found the consent valid. We must affirm a trial court's ruling on a motion to suppress if the evidence is sufficient to sustain the trial court's finding. *State v. Blair*, 691 S.W.2d 259, 260[2] (Mo. banc 1985), *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). We defer to the trial court's superior opportunity to determine the credibility of the witnesses and the weight of the evidence. *State v. Beck*, 687 S.W.2d 155, 157–58[2] (Mo. banc 1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986).

Defendant argues that Elmore's purpose in searching the Datsun was not for proof of ownership but to see whether it contained contraband. That issue, however, was for the trial court's determination. The trial court resolved that issue adversely to defendant. There was ample evidence to support that determination.

Defendant's third point is denied and the judgment is affirmed.

MAUS, P.J., concurs.

PREWITT, J., dissents and files dissenting opinion.

PREWITT, Judge, dissenting.

I respectfully dissent. I believe that the circumstances and Corporal Elmore's testi-

mony establish that his actions after stopping defendant were not to determine if defendant properly had possession of the car, but to coerce defendant into allowing a search of the vehicle for illegal substances. Defendant's third point is correct that his motion to suppress should have been granted. Although defendant's other points raise substantial questions, I believe it unnecessary to reach a decision on them.

Elmore testified that he followed the vehicle defendant was driving for three to five miles on a four lane road until it changed lanes without signalling. Apparently by that time he at least noticed that it had out-of-state, if not Florida, license plates. Elmore testified that after defendant produced the letter from the bank stating that defendant was to return the vehicle to Florida for the bank, he asked for a title on the vehicle which defendant said he did not have. Elmore said he then "explained to him that before I could release him I needed to establish legal—that he had a legal right to the car. I didn't feel that this letter met that qualification. And I asked him if he would object to me looking through the vehicle to try to find something to establish ownership." That search included looking under the seat of the vehicle and into defendant's suitcase which the trooper said he searched "fairly extensively".

Elmore stated that the letter from the bank did not in his "opinion, meet the requirement of the law. He had no legal title to the vehicle." Elmore said he wanted to see a "title for the vehicle". Although requested, Elmore did not call Springfield Nissan where the vehicle had been repaired and defendant had picked it up, until he had searched the vehicle, arrested defendant and went back to headquarters. When he got there he called Springfield Nissan and verified that defendant had picked the vehicle up there that day.

As earlier noted, initially Elmore testified that he told defendant he would not "release him" until he saw further proof of defendant's right to have the car. Later,

Elmore testified that until he found what he thought was cocaine and placed the defendant under arrest, defendant was free to leave. Sergeant Weaver of the Highway Patrol, who arrived after defendant was stopped, but before the cocaine was found, said that although defendant was not under arrest at the time he arrived, defendant could not have left.

It is obvious from Elmore's testimony and his subsequent actions that the stop was a mere pretext for the search. This requires that defendant's motion to suppress be granted. See *State v. Blair*, 691 S.W.2d 259 (Mo. banc 1985). In *Blair*, the defendant was arrested for a parking violation to gather evidence for an unrelated homicide. The court stated that a "well established limitation on the search incident to a valid arrest exception is the rule that an arrest may not be used as a pretext to search for evidence." *Id.* at 262.

A situation strikingly similar to this occurred in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988). There, a New Mexico state police officer stopped the defendant's car after following it for some three miles because the defendant was not wearing a seat belt. The car also had Florida plates. The officer questioned the defendant and asked that he sign a consent form to allow the officer to search the car. He signed the consent form and the officer's search turned up $5000 in cash and a package of cocaine. *Id.* at 1514.

The Tenth Circuit noted that "[i]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1518.

The court in *Guzman* further noted that to determine if a stop was pretextual, "the proper inquiry ... is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the

stop in the absence of the invalid purpose." *Id.* at 1515, citing *United States v. Smith,* 799 F.2d 704 (11th Cir.1986). The *Guzman* court found that although the officer's hunch proved correct and was perhaps a tribute to his intuition, it was not however sufficient to justify a seizure that was not objectively reasonable. *Id.* at 1520.

To allow officers to stop vehicles and search them based upon an offense such as failure to signal in changing lanes, a very common and usually ignored violation in Missouri, " '... places the liberty of every man in the hands of every petty officer,' precisely the kind of arbitrary authority which gave rise to the Fourth Amendment." *Id.* at 1516. Additionally, if these pretextual stops continue the state's recognition of the individual's constitutional rights will depend on "the state of the digestion of any officer who stops us or, more likely, upon our obsequiousness, the price of our automobiles, the formality of our dress, the shortness of our hair or the color of our skin." *Id.*

The state does not refer to any statute or court decision that allows a police officer to hold someone until they establish ownership of a vehicle or a right to its possession after a stop for a routine traffic violation. If a highway patrolman can hold the driver of a vehicle until ownership or a right to possession is established, then, might not a police officer restrain a deliveryman, who is stopped for jaywalking, until he establishes a right to possession of the package he says he is delivering, or even a right to the uniform he is wearing. Of course, allowing that would be ridiculous.

Furthermore even if some proof of right to possession can be required, the trooper's insistence on seeing the car's title defies reason and is completely unrealistic. Seldom does anyone regularly carry a vehicle's title in it, in part because of the danger that if the vehicle is stolen the title would make it easier for the thief to dispose of it. Of course, in many cases a financial institution financing the purchase of the automobile retains the title. Requir-

ing an out-of-state motorist stopped for a traffic violation to produce a title before being released, as Elmore testified he did, is a condition that could take days to fulfill, if at all. Obviously Elmore and defendant recognized this. Furthermore even had the title been present in the vehicle, it would not have established defendant's right to possess the car. Elmore's action constituted an unreasonable restraint, in effect an arrest, without any probable cause. Defendant was improperly and illegally coerced into the search.

Defendant showed Elmore a letter from the bank. He was stopped in the middle of a working day when it would not have been difficult for Elmore, or by use of his radio to have someone at his headquarters, contact the bank if Elmore in good faith really questioned the letter defendant carried. The facts do not support Elmore's contention that he was looking for documents to substantiate ownership or a right to possession. There was nothing more that Elmore could have found that would have supported defendant's right to the car than what Elmore was given and chose to ignore. Certainly Elmore was not going to find such evidence under the seat or in defendant's suitcase. If defendant had such in his suitcase, he would have been aware of it. He gave Elmore all the authorization he had or could have been expected to have.

The evidence obtained in the search was the result of improper action both in the stop and retention of defendant. Evidence obtained directly or indirectly due to the exploitation of police illegality is not admissible. *U.S. v. Klopfenstine,* 673 F.Supp. 356, 360 (W.D.Mo.1987), citing *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). Although the search here was consented to by the defendant, and his consent was found to be voluntary, courts have noted that the "evidence found as a result of such search still must be suppressed if the earlier unconstitutional conduct is not sufficiently attenuated to be purged of the

primary taint." *Klopfenstine* at 360. Here, the consent given was clearly not attenuated from officer Elmore's pretextual stop and threat to hold defendant.

I agree that we must defer to the trial court on matters of credibility, but not where the testimony defies all reason and commonsense. Elmore's testimony established that he deliberately and calculatedly coerced defendant into consenting to the search. To uphold such a search is to allow law enforcement officers, by coercive means, to abrogate the rights of citizens that certain officers obviously do not think citizens should have.