**STATE of Missouri, Respondent,**

v.

**Marty PINEGAR, Appellant.**

**No. WD 30273.**

Missouri Court of Appeals,
Western District.

April 30, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 11, 1979.

Howard C. Gosnell, Jr., Nevada, for appellant; Ewing, Ewing, Carter, McBeth & Smith, Nevada, of counsel.

John D. Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and MANFORD and PRITCHARD, JJ.

PRITCHARD, Judge.

Upon a trial to the court without a jury, appellant was found guilty upon Count I, breaking and entering the Thomas Pharmacy of Nevada, Missouri, and sentenced thereon to three years imprisonment. Aris-

ing from the charge of Count I, appellant was also found guilty of stealing, and his sentence thereon was imposed at two years imprisonment. The sentences run concurrently under § 560.110, RSMo 1969. The court granted the jail time served by appellant, some four months, as a credit on the (concurrent) sentences.

Appellant's points concern his asserted invalidity of a search and seizure of and from a room occupied by him in his mother's and stepfather's home (the Pritchetts), and from his unlocked footlocker in the room. He contends that invalidity not only affects the admissibility of the seized evidence but also his own statements given to an officer following recovery of items from his footlocker.

The evidence elicited upon the pre-trial hearing of appellant's motion to suppress is this: On January 24, 1978, Police Officer Larry Moore and Lt. Delbert Volkman met with an informant and the prosecuting attorney in the latter's office. It was there learned from the informant that appellant had broken into the Thomas Pharmacy and some of the (stolen) drugs were at 217 East Allison in Nevada, Missouri, that being the home of appellant's mother and stepfather. The informant stated that the drugs were in the bedroom, and that appellant had made statements that he had broken in through a wooden door and that the business did not have an alarm system. Upon Officer Volkman's affidavit a search warrant for the residence was obtained from the magistrate. The warrant was not served upon the Pritchetts, however, because they executed a consent to search form. The Pritchetts were told of the existence of the search warrant. The residence was searched on January 27, 1978, and Officer Volkman made a return of the items seized to the magistrate. Upon entering the house, Volkman was shown the room where appellant slept in one of the two beds, and Volkman learned from Mrs. Pritchett that appellant "would just come in for a few minutes or maybe not show up at all. * * * Q. He was probably living elsewhere? A. Staying elsewhere, yes, part-time. Q. It was essentially Marty's brother's bedroom, is that correct? (Objection) Q. Whose bedroom was it? A. I was aware there *was* two single beds in it, as I recall the younger boy slept in one of the beds. Q. Where did you find the contraband drugs? A. In a black footlocker at the foot of Marty Pineger's bed. Q. Was the footlocker open or shut? A. It was shut. Q. Was it locked? A. No, it was not locked. Q. You opened it up? A. Yes. Q. What did you obtain out of the locker? A. Several bottles of drugs, supposedly drugs."

Mr. Pritchett testified that the officers searched the two upstairs rooms pursuant to the consent to search form, including the north room in which appellant stayed. His own nine-year old son had stayed there at one time, but he had been sleeping downstairs. "Q. In fact, at this time the only warm body occupying this room was Marty Pinegar, is that correct? A. That's right." No one else lived in the room; appellant had been living there two or three months on a continuous basis; he moved into his own apartment after he got out of the military service, then moved back to the house, then to another apartment after that; then back to the house. According to Mr. Pritchett, it would be fair to say that appellant was, in fact, living there. Mr. Pritchett further testified that after appellant came back from the military service, he contacted the prosecuting attorney about appellant's having a bad check out, that he had thrown him out of the house and that he could not keep him from coming back. There was testimony from Mrs. Pritchett that in order to get to the other room on the second floor, she had to pass through the room where appellant's footlocker was located, but it was a fair statement that the room was appellant's, and that when the room was cleaned, it was appellant who did it.

The motion to suppress was renewed at the start of the trial and was again overruled. At that time Officer Volkman testified that the Pritchetts had signed a consent to search their premises at the police station. He went to the upstairs north

bedroom and during its search, he found a footlocker at the foot of the bed which was pointed out to him as the place where appellant slept, and on looking in the footlocker, he found a paper sack containing a plastic bag with several bottles of drugs in it. [These drugs were later identified as coming from the Thomas Pharmacy.]

Appellant was picked up and brought to the Nevada Police Department on January 27, 1978, where Volkman questioned him, first giving him his *"Miranda"* rights, and having him sign a waiver of those rights. Volkman testified: "THE COURT: Did you tell him about the search before you interviewed him? A. Before the interview? THE COURT: Yes. A. Not that I recall. THE COURT: Did you tell him what you had found? A. We talked about the break-in and so forth and then later I showed him what we found in the search. * * * Q. Did Mr. Pinegar make a statement before or after he was aware that the items listed as Exhibits 1 through 13 had been recovered from his parents' home? A. He made the statements to me before the drugs were shown to him. We talked about it for a few minutes before that. * * * Q. * * * At the time you advised Marty Pinegar of his rights and he began the statement set out in Exhibit 17, when were the drugs shown to him? A. He made the statement to me concerning the break-in before I showed him the drugs. Q. Did you tell him about the drugs being recovered? A. Not that I recall, no."

■ It should be noted that the state does not rest the validity of its search and seizure upon the search warrant procured by it, but only upon the consent to search given by appellant's mother and his stepfather. The search warrant was never delivered or served upon the latter two persons. See the requirement that a copy of the warrant be delivered by the officer to the person from whose possession property was taken, along with an itemized receipt of the property, in § 542.291, sub. 4, Laws Mo. 1974, p. 922, § 7. The burden of proof was upon the state to prove the validity of the consent given. *State v. Peterson,* 525 S.W.2d 599, 609 (Mo.App.1975). As pointed out by appellant, older cases have permitted parents to give consent to a search of a home in which children have a room upon the parents' "property interest" theory, wherein children have no standing to object. See, e. g., *State v. Pruitt,* 479 S.W.2d 785 (Mo. banc 1972). That concept has been relaxed, however, in favor of one which bases the right to search and seizure evidence upon a child's right to a reasonable expectation of privacy. See *In re J.R.M.,* 487 S.W.2d 502 (Mo. banc 1972), where it was held that a child, regularly using a car for which he was not the record owner, had standing, an adequate possessory interest in the car, to challenge its search and items therein seized as evidence. In *U. S. v. Brown,* 300 F.Supp. 1285 (D.C.N.H.1969), the court held that defendant had standing to challenge a search of his suitcase even though it was in another person's home. In *State v. Peterson,* supra, the court held there was no authority on the part of the parent to consent to the search of defendant son's room, which was exclusively his area within the parents' home, because defendant had a reasonable expectation of privacy which was personal to him which could not be waived by his parents. In *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), a footlocker which had been lawfully seized from the open trunk of a parked car during arrests, was searched without a search warrant more than an hour later. It was held that those from whom the footlocker had been seized were entitled to the protection of the warrant clause of the Fourth Amendment before their privacy interests in the contents of the footlocker could be invaded, and its search violated that amendment. In *Reeves v. Warden, Maryland Penitentiary,* 346 F.2d 915 (4th Cir. 1965), a search without warrant of petitioner's room, authorized by his mother, also a tenant in petitioner's sister's home, and of his private bureau drawer herein incriminating evidence was found and introduced into evidence, was found to be violative of his Fourth Amendment rights. See also the therein cited and quoted case of *United States v. Rees,* 193

F.Supp. 849 (D.C.Md.1961). In *United States v. Wilson,* 536 F.2d 883 (9th Cir. 1976), it was noted that a tenant, McKee, could effectively consent to a search of her apartment, but she had neither actual or apparent authority to consent to a search of the three codefendants' suitcases therein, citing *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). It was noted, 536 F.2d 885[2], that defendant Wilson had standing to challenge the search of his own suitcase, but the evidence that he sought to suppress was found during a search of codefendant Willis' suitcase, and under the circumstances, Wilson was in no position to claim any expectation of privacy in Willis' suitcase.

■ Although there here may be some question as to whether appellant had a reasonable expectation of privacy in the second floor room, used infrequently by him, shared at times by another, and the access to which was open to others in the family, the disposition of this aspect of the warrantless search need not turn upon a determination of the validity of the consent to the room search. Rather, the inquiry focuses upon the search of appellant's footlocker from which the incriminating evidence was seized. Under the foregoing cases, it must be held that appellant had a reasonable expectation of privacy in his personal footlocker, and that its search violated his Fourth Amendment rights. The motion to suppress the evidence seized from the footlocker, and the objection to its admission into evidence at trial, should have been sustained, and it was error not to do so.

The matter next to be considered is *whether, under the evidence, appellant's* written and signed confession, given after warning of his *Miranda* rights, was tainted by the above held illegally seized evidence from his footlocker. Appellant urges that his confession was "fruit from the poisonous tree." The standard for the applicability of the doctrine is set forth in *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963): "* * * [T]he more apt question in such a case is whether, granting the establishment of the

primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." See the extensive analysis of the doctrine in *People v. Johnson,* 70 Cal.2d 541, 75 Cal.Rptr. 401, 450 P.2d 865 [modified on other grounds, *People v. DeVaughn,* 18 Cal.3d 889, 135 Cal.Rptr. 786, 558 P.2d 872 (1977)]. In that case, the apartment of codefendant Howard was illegally searched, and after being warned of his *Miranda* rights, and after being shown a seized TV set and being asked about it, he confessed, implicating defendant Johnson. Johnson was arrested and first denied any involvement, but when confronted with Howard, who repeated his confession, Johnson confessed. He objected to the admission of the confession in the court tried case on the ground that it was induced by Howard's confession, which was inadmissible because the search of Howard's residence and his arrest were unlawful. It was held that the confession of Johnson was the fruit of the unlawful search, the court saying, 75 Cal.Rptr. 403, 450 P.2d 867[13], "The rule is settled that where a confession *is induced by illegally seized evidence,* the confession is subject to exclusion as fruit of the poisonous tree. (Citing cases)" (Italics added.) See also *State v. Dudley,* 561 S.W.2d 403 (Mo.App.1977), where an illegally seized suitcase was opened in the presence of defendant, who then, after *Miranda* warnings, gave a tape recorded confession, held to be fruit of the poisoned tree; and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), which applied the taint of an illegal arrest, made without warrant or probable cause, to a confession given less than two hours later, and held also that the giving of *Miranda* warnings did not, by themselves, purge the taint of the illegal arrest.

■ The matter of a possible taint of appellant's confession did not come out on the pre-trial hearing to suppress evidence, the issue there being only the validity of the search and seizure. A fair reading of the testimony of Volkman adduced at tri-

al, considered in its light most favorable to the state, leads to the conclusion that the matter of the seized evidence was talked about after appellant gave his statement: "THE COURT: Did you tell him about the search before you interviewed him? * * A. Not that I recall. * * * Q. Did Mr. Pinegar make a statement before or after he was aware that the items as Exhibits 1 through 13 had been recovered from his parents' home? A. He made the statements to me before the drugs were shown to him. We talked about it for a few minutes before that." And, again, Volkman testified that he did not, as he could recall, tell him about the drugs being recovered. The fair inference, considering the whole of the testimony, is that the talking "a few minutes before that" referred to time that the drugs were shown to appellant, i. e., after the statement was given. Under the circumstances here, and an application of the standards which might establish a confession to be a "fruit of the poisonous tree", it must be held that appellant's confession was not induced by the illegally seized evidence. It was therefore not tainted and was admissible in evidence on the issue of appellant's guilt of the charges of breaking and entering and stealing independent of the evidence resulting from the illegal search and seizure.

 The question lastly becomes whether the error in admitting the illegally seized evidence was harmless, i. e., did it reasonably affect the outcome of the case? The evidence seized, had it been admissible, would have had equal weight for the trier of the fact, the court, as the confession. Thus, the admission of the seized evidence did not overwhelmingly tip the scales against appellant as it was held to have done in *State v. Clark*, 259 S.W.2d 813 (Mo. 1953). Nor is it the "powerful" and "persuasive" evidence of the kind held in *State v. Howell*, 524 S.W.2d 11, 18[4] (Mo. banc 1975), to be prejudicial error requiring a new trial. Nor is it a case of circumstantial evidence which was corroborated by highly persuasive illegally searched and seized evidence which was in *State v. Hicks*, 515 S.W.2d 518, 522 (Mo.1974), held not to be

harmless. Appellant's untainted confession, being not otherwise contested by him as to its voluntariness, was comparable to what would have been his own testimony by way of an admission of guilt. This situation is similar to *State v. McGee*, 447 S.W.2d 270, 275 (Mo. banc 1969), where a violation of defendant's *Miranda* rights was held to be harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), where he testified to the facts claimed to be self-incriminating.

No reversible error appearing, the judgment is affirmed.

All concur.