**STATE of Missouri, Respondent,**

v.

**Gary W. ENGEL, Appellant.**

**Gary W. ENGEL, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 45376, WD 46527.**

Missouri Court of Appeals, Western District.

July 13, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1993.

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, P.J., and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

The defendant was charged and found guilty by a jury on two counts of kidnapping and on two counts of armed criminal action. The court sentenced the defendant in accordance with the jury recommendation of thirty years each for kidnapping and fifteen years each for armed criminal action, the sentences to run consecutive to each other.

The defendant filed his post-conviction Rule 29.15 motion and following an evidentiary hearing, the motion was denied. The appeals have been consolidated and the sufficiency of the evidence is not in dispute.

In February 1984, Charles Ford returned to his apartment between 2:00 and 3:00 a.m. with his friend, Mark Harris. Ford was an acknowledged drug dealer. As he was getting out of his truck, two men, the defendant and one, Steve Manning, ran toward them calling out Ford's name, flashing badges and identifying themselves as D.E.A. agents. They "arrested" Ford and Harris, handcuffed them and placed them in the back seat of a car.

Once in the car, Ford and Harris were blindfolded with duct tape. Ford questioned the necessity of a blindfold if they were being taken to jail. The abductors responded that they were not, in fact, D.E.A. agents. While they were blindfold-

ed, Manning struck Harris across the shoulder with a pipe causing Harris to urinate in his pants. Ford overheard one of his captors over a walkie talkie, telling a third individual to get Ford's truck.

The defendant and Manning drove Ford and Harris to a location later identified as a "safe house," which was used by the abductors. Ford and Harris were secured to a pole and told that there was a $100,000 bounty on Ford. They were told that their lives would be spared if they paid the abductors the bounty. Ford told his abductors that he could not raise that much money but probably could raise approximately $50,000. In order to raise the money, Ford first contacted his roommate and instructed him to drop off a particular briefcase which contained several thousand dollars. He also called his daughter at his Lake of the Ozarks home and told her to bring a bag, which contained approximately $12,000. Both individuals were told to deliver the money to his sister's house in Kansas City. He also obtained a $5,000 loan from his sister. Manning and another accomplice, Anthony Mannolito, made two trips to Ford's sister's residence to recover the money.

The defendant saw two rings on Ford's fingers and took them. Ford protested the taking of one that had great sentimental value and the defendant returned it. He kept the other ring, which was a custom made diamond cluster ring with some indentations on the band.

After dividing the money among the four kidnappers (Thomas McKillip was the fourth), they released Ford and Harris. The abductors dropped them off by an open grave at a cemetery and left Ford's truck a block or two away. Ford removed his blindfold but was unable to get a good look at his abductors.

The defendant returned home to Chicago with, among other items, Ford's cluster ring. The defendant's former wife, Sharon Duggan, testified to many of the following facts. The defendant bragged about "this big score he made in Kansas City, how they kidnapped two guys, posed as D.E. agents, [and] made one guy shit in his pants." He was always laughing about that and how they released them in front of an open grave so he knew they would never talk. She testified that just prior to the kidnapping she saw her husband with a book entitled, *How to Rip Off a Drug Dealer.* She identified the ring defendant brought home with him and testified that he admitted taking it from one of the kidnapped victims.

Following an evidentiary hearing, the defendant's Rule 29.15 motion was overruled and consolidated with this appeal. The defendant alleged in his Rule 29.15 motion that his attorney was ineffective because counsel failed to ensure his right to a speedy trial.

The defendant was arrested in Illinois on July 26, 1990, waived extradition and was transported to Clay County, Missouri on August 2, 1990. From the time of the associate court arraignment on August 16 and until March 13, 1991, the defendant was represented by assistant public defender, Ms. Kate Ladesh. From March 13, 1991, and until May 31, 1991, the defendant was represented by Mr. Harold Caskey. The defendant's attorney at trial and on direct appeal was Mr. F.A. White, Jr. On August 16, the defendant was arraigned on a complaint filed in the associate circuit court. On October 18, he was arraigned on the information and entered a plea of not guilty. The defendant testified he personally demanded a speedy trial at both of his arraignments in associate and circuit court. He also testified that he communicated his desire for a speedy trial to his then trial counsel, Ms. Kate Ladesh. Ms. Ladesh did not recall whether she represented the defendant at arraignment or whether he made a demand for speedy trial.

■ The defendant's first point deals with the seizure of his property. The defendant filed a motion to suppress the seizure of the three briefcases found in defendant's bedroom, which he shared with a Vikki Howard. In one of the seized briefcases was the book entitled, *How to Rip Off Drug Dealers.* The defendant submits that the court's ruling on his motion to

suppress was improper for three reasons. The defendant first questions the validity of Ms. Howard's "consent," but continues his argument that, if the consent was proper, the officers exceeded the scope of the consent, and finally, maintains Ms. Howard did not have the right to give consent to the defendant's property over which she had no control. The motion to suppress was denied by the trial court and the evidence was submitted to the jury.

■ In reviewing the trial court's ruling on the motion to suppress, we determine only whether the evidence is sufficient to support the court's finding, *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990), viewing the evidence and reasonable inferences arising therefrom favorably to the trial court's order. *State v. Barnett*, 767 S.W.2d 38, 39 (Mo. banc 1989).

■ One exception to the Fourth Amendment of the United States Constitution that a warrant shall be issued before any search of one's property is a "consent search." A party may agree to a search and thereby waive his constitutional right to the display of a warrant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). In determining whether a consent search is valid and not coerced, several factors must be considered. *State v. Stolzman*, 799 S.W.2d 927, 936 (Mo.App.1990). Relevant factors include the number of officers present, the degree to which they emphasize their authority, whether weapons were displayed, whether the person was already in police custody, whether there was any fraud on the part of the police officers, the acts and statements of the consenter, and any other matters constituting the totality of the circumstances. *Id.* Whether a consent is voluntarily given is to be determined from the totality of the circumstances. *Id.*

F.B.I. Agent Robert Buchan arrived at the defendant's apartment at about 2:00 p.m. on August 3, 1990, accompanied by Sergeant Quid of the Buffalo Grove, Illinois police department. They contacted Ms. Vikki Howard who was the defendant's girlfriend and co-lessee of the apartment. They told her they were searching for various items which Agent Buchan had been informed were stolen from Charles Ford's residence by the defendant.[1] Ms. Howard invited them inside. She recognized Agent Buchan from several days earlier when he had been at the apartment to arrest defendant. Since the officers did not have a search warrant they requested permission to search the apartment. They were looking for a homemade video tape and guns and made the objects of their search known to her. Ms. Howard told Agent Buchan to "feel free" to search the apartment.

In an open closet in the bedroom shared by the defendant and Ms. Howard, Agent Buchan and Sergeant Quid saw a locked black briefcase in plain view. By shaking it, Agent Buchan realized there were objects inside so he seized the briefcase but did not break it open. They also discovered two unlocked briefcases on a table in the main area of the bedroom. Sergeant Quid opened them to discover, among other things, a book entitled, *How to Rip Off a Drug Dealer*.

After making an inventory of the seized items and as they were about to leave, Agent Buchan asked Ms. Howard to sign a consent to search form. She readily signed the form. Agent Buchan later obtained a warrant to search the locked briefcase.

The trial court ruled that Ms. Howard's consent was freely and voluntarily given and that she was not coerced. Ms. Howard knew Agent Buchan, neither officer displayed weapons, both were dressed in civilian clothes, they did not engage in trickery or deceit in order to obtain the consent, nor did either threaten Ms. Howard in any manner. Considering these factors and the totality of the circumstances surrounding the officers' search, we conclude there was sufficient evidence to support the trial

---

1. Anthony Mannolito had told the authorities that the defendant and Manning had broken into Ford's apartment to determine its "layout" and had stolen various articles from there. The officers were acting on this information.

court's finding that held the search was proper and no coercive force was used.

■ The defendant next argues, assuming Ms. Howard's consent was freely and voluntarily given, that the officers exceeded the scope of the consent she gave. The defendant does not specifically define in what manner the officers search exceeded the scope of the consent, but we read defendant's argument to mean that they were given permission to search for a homemade video tape and guns so that seizing the book was in excess of the consent. The defendant argues that in order to obtain a search warrant, an officer would have to submit an affidavit describing with particularity not only the place to be searched but also the item or things to be seized. *Mo. Const.* art. I. § 15. He also cites § 542.-276, RSMo Supp.1989 which requires that a search warrant shall not only identify the person, place or thing which is to be searched, but it must do so in sufficient detail and particularity, that the officer executing the warrant can readily ascertain for what he is to search.

■ The standard for measuring the scope of one's consent under the Fourth Amendment is that of objective reasonableness. *Florida v. Jimeno*, —— U.S. ——, ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). The court must consider what the "typical reasonable person [would] have understood by the exchange between the officer and the [one granting consent]." *Id.* at ——, 111 S.Ct. at 1803–04. Furthermore, the scope of a search is generally defined by its expressed object. *Id.* at ——, 111 S.Ct. at 1804.

In this case, Agent Buchan expressed the object of the search when he told Ms. Howard that he was looking for a homemade video tape and guns, to which Ms. Howard responded, "feel free" to search the apartment. That exchange, applying an objective reasonableness standard, allowed the officer to search the apartment where a video tape or guns were located. In the course of the search, they found three briefcases in plain view. One of them contained an item inside which could have been one of the objects of the search. There-

fore, the seizure of the book did not exceed the scope of the consent given.

■ In the third part of defendant's first point, the defendant complains that Ms. Howard had no right to consent to the warrantless search of his briefcase, as that was property over which she had no control. The three briefcases seized did not belong to Ms. Howard, but rather were owned by the defendant. The defendant cites *State v. Pinegar*, 583 S.W.2d 217, 220 (Mo.App.1979), where this court held that the defendant had an expectation of privacy in his unlocked personal footlocker which was located in the second floor bedroom used infrequently by the defendant, was shared by another and open to others in the family. Several bottles of drugs (later identified as belonging to a burglarized pharmacy) were taken from the footlocker by the officers upon a written consent to search signed by the defendant's mother and stepfather. The court held that it was error to overrule a motion to suppress the evidence and allow the drugs seized from the footlocker into evidence. *Id.*

The state agrees with the *Pinegar* result and that Ms. Howard was not authorized to consent to the police officers search of the briefcases. However, the state argues that the book seized from the briefcase was admissible because it inevitably would have been discovered.

The doctrine of inevitable discovery was first enunciated in Missouri in *State v. Byrne*, 595 S.W.2d 301, 304–05 (Mo.App. 1979), *cert. denied*, 449 U.S. 951, 101 S.Ct. 355, 66 L.Ed.2d 215 (1980), where the police seized the defendant's gun used to kill a police officer. The gun was "under a cookie dish" in the kitchen of a house where the defendant was arrested. The defendant was not given a *Miranda* warning because he had been shot, was in shock, and not capable of comprehending such a warning. Nevertheless, the defendant was asked by the police where the gun could be found and the defendant responded "under a cookie dish," where it was immediately located by the police officer. The court con-

cluded that the "officers arresting the defendant would have uncovered the gun regardless of defendant's illegally elicited statements." *Id.* at 305.

Next, the United States Supreme Court in *Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984) held that the inevitable discovery doctrine allows illegally obtained evidence to be admitted if it would have inevitably been discovered by lawful means. Justification for the rule was established by Chief Justice Burger when he stated that if the state is able to prove by a preponderance of the evidence that the evidence would ultimately or inevitably be discovered by lawful means "the deterrence rationale [deterrence of unlawful police conduct] has so little basis that the evidence would be received." *Id.* at 444, 104 S.Ct. at 2509.

The Eighth Circuit applied the doctrine in the *United States v. Apker*, 705 F.2d 293, 306–07 (8th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). In *Apker*, state and federal agents searched the defendant's residence with an invalid search warrant, found and seized the guns used to convict the defendant of violation of federal firearms laws. The Eighth Circuit upheld the admissibility of the firearms seized under the illegal warrants, "because it was inevitable that the guns would have been discovered during the execution of the valid state warrants." *Id.* at 309–10.

Finally, in *State v. Butler*, 676 S.W.2d 809, 812 (Mo. banc 1984), our Supreme Court acknowledged the doctrine and applied it to the seizure of two pieces of bedclothing obtained during a warrantless search. The bedclothing, with an incriminating bullet hole, was substantial evidence leading to the defendant's conviction. The police went to the bedroom and took the bedclothing. The Supreme Court held that a search warrant could have been obtainable and "any half-decent investigation would take the officers into the bedroom" where the incriminating evidence would have been discovered inevitably by legitimate means. *Id.* at 813.

In the case before us, the defendant had been arrested and was in police custody. The officers had information that the defendant had stolen items from the kidnapped victim's apartment. It would be likely that they would conduct a complete search of defendant's premises in order to connect the defendant to the crime by discovery of stolen items from the kidnapped victim. The stolen items were obviously a prime object of the police investigation and a reasonable place to locate stolen items would be in his apartment, a location where he had just been arrested several days earlier. The police officers were properly in the defendant's apartment when they saw three briefcases in plain view. A search warrant was obtained for the search of the locked briefcase. Had they not been confused about the illegality of opening the unlocked briefcases and seizing the book in question, they would have obtained a valid search warrant, as they did for the locked briefcase. We conclude that the police, following legal procedures, inevitably would have discovered the book in question and to suppress this evidence would accomplish no worthy purpose. Point denied.

■ The defendant's second point is again directed to the book, *How to Rip Off Drug Dealers*, claiming that the publication was not produced timely in order for the defendant to properly investigate whether the book was in the defendant's possession before the kidnappings. Since the book has a publication date of December 1983, and the kidnappings took place in February 1984, the defendant's attorney claimed lack of time to discover how the book was marketed to determine if the defendant could actually have possessed the book at the time of the kidnappings. The defendant does not tell us what steps were necessary to investigate the marketing procedures or how long it would take. The prosecuting attorney advised the defendant of the book shortly after learning of its existence, nevertheless, the defendant seems to suggest that the state should have disclosed the book without a request and upon the state's knowledge of the book.

■ Absent a statutory provision or rule of court, discovery is not a matter of right. *State v. Garner*, 799 S.W.2d 950, 956 (Mo.App.1990). Rule 25.03 furnishes the defendant the discovery procedure. It requires that the state, "upon written request of defendant's counsel," disclose to defendant's counsel any books which the state intends to introduce into evidence at trial and which were obtained from or belonged to the defendant. Rule 25.03. The rule directs disclosure without a court order but calls for the defendant to make a written request in order to start the process. The defendant filed his written request on May 31, 1991, and the state promptly responded. Defendant filed a motion to suppress the book with the trial court on the grounds that the state failed to timely respond. The motion was overruled.

■ Whether the state violated the rules of discovery rests within the sound discretion of the trial court. *State v. Biggs*, 713 S.W.2d 618, 621 (Mo.App.1986). Rule 25.16 allows for certain sanctions, which are available to the court, if it is determined a party has failed to comply with discovery rules. Among the remedies available to the court are to grant a continuance, exclude the withheld evidence, or other appropriate relief. Nevertheless, the defendant cannot convict the court of error when he failed to effect an appropriate remedy such as a short continuance of the case in order to resolve the problem of lack of time to investigate. *See State v. Lahay*, 687 S.W.2d 604 (Mo.App.1985). The state cannot be sanctioned for any delay in producing the book when it immediately responded on a proper request.

■ The defendant next requests plain error review of rebuttal testimony of Agent Buchan. He had a conversation with the defendant when the defendant offered to testify against an accomplice if the police would put him in the witness protection program. Apparently this conversation was offered in rebuttal to disprove the defendants direct examination testimony that he was not involved in the kidnappings of Ford and Harris. Agent Buchan's conversation with the defendant took place after the defendant had been arrested and in spite of the fact the officer knew the defendant had counsel. No *Miranda* warning was given. The defendant claims a Sixth Amendment violation and because no objection was registered before the rebuttal testimony, requests plain error review.

Rule 29.12(b) provides that plain errors affecting substantial rights may be considered by the court when, in the court's discretion, it finds the error results in manifest injustice or miscarriage of justice.

Agent Buchan's testimony follows:

Q: Now, can you tell us would you tell the members of the jury what the defendant told you with regard to the allegations.

A: He told me that he would be willing to testify against Steven Manning regarding the kidnapping. He further told me that if he did so testify in that and other matters, he would want to be placed in the Witness Protection Program, which is a program the Federal Government provides to protect witnesses.

The statement is ambiguous when construing it as an admission against the defendant's interest. Agreeing to testify against another does not, standing alone, admit to a crime. Nevertheless, the statement was offered by the state so that the jury would draw the inference of his involvement in the crime.

■ The admission of this statement, like any impeaching evidence, is premised on the proposition that a trial of a lawsuit is a search for truth. The impeachment process provides a jury with valuable information in assessing the defendant's credibility. This rebuttal evidence is subject to the rule that the state may use illegally obtained statements of the defendant to impeach his direct examination testimony, provided the statements were made voluntarily. *State v. Wilkerson*, 796 S.W.2d 388, 395 (Mo.App.1990).

In *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971), Harris denied he made two sales of heroin. On cross-examination he was questioned about statements he made following his arrest that tended to contradict his courtroom testimony. The prosecutor acknowledged that the out-of-court statements were inadmissible because the defendant had not been advised of his rights under *Miranda.* The Chief Justice spoke for the majority making two important points. To allow this testimony does not defeat the purpose of the exclusionary rule and its deterrent effect, because "sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Id.* at 225, 91 S.Ct. at 645. The Court also observed that the "shield provided by *Miranda* cannot be perverted by the way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* at 226, 91 S.Ct. at 646; *Oregon v. Hass*, 420 U.S. 714, 721–22, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975). To the extent the statement was impeaching evidence inconsistent with the defendants direct examination testimony, it was properly admitted. Point denied.

### Rule 29.15 Motion

■ The defendant claims that his trial attorney Ms. Ladesh was ineffective by failing to obtain a speedy trial. Our review is confined to a determination of the motion court's findings and conclusions and whether they were clearly erroneous. Rule 29.-15(j); *State v. Perkins*, 831 S.W.2d 637, 641 (Mo.App.1992).

■ The defendant argues that his situation is governed by § 545.780, RSMo 1978 (repealed June 7, 1984), which was the law in effect at the time his crime was committed. The statute at that time required that a trial commence within 180 days of arraignment. Because the defendant's trial started approximately eight months after his arraignment, he claims that the charges should have been dismissed, citing *State v. Bullington*, 680 S.W.2d 238 (Mo.App.1984). In *Bullington*, this court held that even though § 545.780, the "Speedy Trial Act,"

was in effect when proceedings commenced against the defendant, it did not apply to defendant's case because the crimes charged were committed prior to the effective date of the Act. *Id.* at 242. From this holding, the defendant maintains that since his crime was committed in February 1984, when § 545.780 was in effect, the Speedy Trial Act should be controlling.

■ The Speedy Trial Act is a procedural law subject to repeal without ex post facto consequence. *State v. Loewe*, 756 S.W.2d 177, 181 (Mo.App.1988). The exception found in *Bullington* applies only to crimes committed before January 1, 1979:

> The provisions of this code do not apply to or govern the construction of and punishment for any offense committed prior to January 1, 1979, or the construction and application of any defense to a prosecution for such an offense. Such an offense must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner as if this code had not been enacted, the provisions of § 1.160, RSMo, notwithstanding.

§ 556.031.3, RSMo 1986.

Therefore, the applicable law at the time of the commencement of the defendants trial date was the law on the books at the time the charges were filed against him in February 1990. The law at that time was § 545.780, RSMo 1986, which states in part:

1. If defendant announces that he is ready for trial and files a request for a speedy trial, then the court shall set the case for trial as soon as reasonably possible thereafter.

2. The provisions of this section shall be enforceable by mandamus. Neither the failure to comply with this section nor the state's failure to prosecute shall be grounds for the dismissal of the indictment or information unless the court also finds that the defendant has been denied his constitutional right to a speedy trial.

■ The statute sets no deadline, and certainly not a deadline of 180 days, except as the trial court may find a denial of the

defendant's constitutional rights. The motion court in this case made no such finding. Nevertheless, the defendant continues his argument that in the event we conclude that the previous Speedy Trial Act is not applicable, the new provisions, even without a deadline, are applicable to his right to a speedy trial and were violated since the court did not set the trial date "as soon as reasonably possible." § 545.780.1, RSMo 1986. He claims he was prejudiced by the delay in setting his case for trial because he lost the whereabouts and therefore, the testimony of Ms. Howard who would have testified that his former wife broke into his house prior to the search by the officers. He does not further define how this act resulted to his detriment. He further alleged that Ms. Howard would testify she never consented to the search by the law enforcement officers.

In order to satisfy the second prong of *Strickland,*[2] the defendant claims that his continuous incarceration from his arrest until trial caused him to lose track of Ms. Howard's whereabouts and she was not a witness available to the defense. This point is probably put to rest by the fact that this allegation was not raised in either the defendants *pro se* motion or in his amended motion. The motion court allowed the defendant to raise this point for the first time at the hearing. All grounds for relief must be filed in a timely manner or the defendant waives the charge. Rule 29.15(d); *Rohwer v. State,* 791 S.W.2d 741, 744 (Mo.App.1990).

Rather than decide the point on a procedural ground, we address it on the merits. Such a charge, if timely made, would not warrant relief. At the motion hearing, Ms. Ladesh testified that it was her trial strategy to delay Mr. Engel's trial so that his co-defendant, Steven Manning, would be tried first, which would allow her to use the testimony in that trial for impeachment purposes in the defendant's trial. She testified that this strategy was agreed upon

between her and the defendant and that the defendant considered such an approach to be in his best interests. Further, Ms. Ladesh testified that if the defendant had not agreed to her assessment of the matter, she would not have followed it. The motion court found Ms. Ladesh's testimony to be credible and the defendant's to be incredible. There was evidence to support this finding.

The court continued the case on its own motion on February 8, 1991, when the defendant was personally present and made no protest. The defendant was personally present on March 13, 1991, and March 22, 1991, when the defendant requested continuances. The court found that nothing in the record indicated that the defendant was desirous of a speedy trial. We defer to the motion court's determination on the issue of the witness' credibility. *Kayser v. State,* 784 S.W.2d 820, 821 (Mo.App.1990). Point denied.

The judgments of convictions and denial of the Rule 29.15 motion are both affirmed.

All concur.

---

**2.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) requires that to establish ineffective assistance of counsel, the attorney's lack of skill must result in prejudice to the defendant. This prejudice is described as

a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.