805 So.2d 818 (2001)
STATE of Florida, Appellant/ Cross-Appellee,
v.
Andrew MIYASATO, Appellee/ Cross-Appellant.
No. 2D00-936.
District Court of Appeal of Florida, Second District.
March 7, 2001.
Opinion on Motion to Stay or Withdraw Mandate October 26, 2001.
*819 Robert A. Butterworth, Attorney General, Tallahassee, and Patricia E. Davenport, *820 Assistant Attorney General, Tampa, for Appellant/Cross-Appellee.
James Marion Moorman, Public Defender, and William L. Sharwell, Assistant Public Defender, Bartow, for Appellee/Cross-Appellant.
ALTENBERND, Acting Chief Judge.
The State appeals the trial court's order granting Andrew Miyasato's motion to suppress marijuana, which detectives found in his pocket. Mr. Miyasato cross-appeals the trial court's denial of his motion to suppress marijuana and Xanax, which the detectives found in his bedroom desk. We affirm the order of suppression and reverse the order denying suppression.[1] We hold that, when an adult lives with his or her parents and maintains a separate bedroom, the police may not obtain consent to search inside furniture in that bedroom from a parent without first establishing that the parent has equal access and common authority over the contents of that furniture.
Mr. Miyasato was twenty-three years old at the time of these events. He lived in a bedroom in his parent's house with his girlfriend and their infant child. He did not work or pay his mother rent, although he did occasionally purchase food for the household. There was no rental agreement between Mr. Miyasato and his mother.
The facts in this case are well explained by Judge Maloney in his suppression order:
An individual was found to be in possession of marijuana and was arrested by a deputy sheriff. The individual was asked where he got the marijuana and he said that he bought it from the defendant, Miyasato. He gave the deputy Miyasato's address. With this information, other deputies went to that address and found Miyasato and another man playing basketball in the driveway.
The deputies told Miyasato why they were there, asked if he was in possession of any marijuana, and asked for permission to search the residence. Miyasato suggested that they go into the residence so that they could speak with his mother, the owner of the residence.
Once inside the deputy saw, protruding from Miyasato's pants pocket, a portion of a clear plastic bag. He asked what it was and reached down to try to feel it. Miyasato turned away so that the deputy could not feel his pocket and he pulled his shirt out to cover the pants pocket. He also suggested that they leave his mother's presence and step into the garage. When they got to the garage, the deputy grabbed the bag out of Miyasato's pocket and found that it contained marijuana. Miyasato was arrested at that time. Contemporaneous with this activity another deputy was speaking with Miyasato's mother and asked her for permission to search Miyasato's room. She said she did not want any drugs in her house and gave permission for the search of the room. She was not aware, at the time she gave permission, that her son had been arrested. More drugs and money were recovered from [inside a desk in Mr. Miyasato's bedroom].
We affirm the trial court's suppression of the marijuana found in Mr. Miyasato's pocket. The deputy did not have probable cause to either arrest or search Mr. Miyasato at the time that he grabbed the corner of the plastic bag and *821 removed the bag from Mr. Miyasato's pocket. See Harris v. State, 352 So.2d 1269, 1270 (Fla. 2d DCA 1977). The deputy admitted that this search was not intended to be a Terry[2] frisk. He was not conducting a search for officer safety on the belief that the bulge was a weapon. See State v. Webb, 398 So.2d 820, 824-25 (Fla.1981). The record does not establish a basis to permit this seizure as the result of a "plain feel" during a lawful pat down. See Minnesota v. Dickerson, 508 U.S. 366, 369-70, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); Hines v. State, 737 So.2d 1182, 1187 (Fla. 1st DCA 1999). See also T.W.C. v. State, 666 So.2d 217 (Fla. 2d DCA 1995). Even though the officer claimed he saw the corner of a plastic baggie sticking out of Mr. Miyasato's pocket and knew marijuana was often carried in plastic baggies, these facts would give rise to, "at most, a mere suspicion" that it contained marijuana, which was not enough to seize it. See Harris, 352 So.2d at 1270.
The trial court recognized that the seizure of additional evidence from inside the desk was a close issue. At the time the deputies obtained consent to search this room from his mother, Mr. Miyasato was detained on the premises and had given no consent to search his desk. Because Mr. Miyasato was present at the time of this search, we question whether the deputies were authorized to obtain consent to search his room from his mother, at least upon the limited information the deputies received from the mother about her access and control over that room.[3] For purposes of this opinion, however, we assume that Mr. Miyasato's mother could authorize a general search of his bedroom. We conclude that the deputies did not establish that she had sufficient authority to permit a consensual search of the contents of Mr. Miyasato's personal desk.
The record simply does not establish that the mother had actual or apparent authority to authorize a search of Mr. Miyasato's personal effects inside his desk. The police did not determine that she owned or used the desk or had regular access to its contents. Even if police had determined that Mrs. Miyasato regularly cleaned the desk drawer, it is questionable whether that would have been sufficient common authority to validate her consent to search it. See Silva v. State, 344 So.2d 559 (Fla.1977) (holding live-in partner's access to defendant's personal closet ["only"] for cleaning purposes did not amount to joint access and control to give her common authority to give valid consent to search closet, regardless of whether the *822 defendant was present or absent). Cf. Preston, 444 So.2d at 943 (reasoning that mother had authority to consent to search of son's open bedroom garbage can because "this was not a closet or bureau drawer.").
In this case, there was no showing of any common authority over the desk that would diminish Mr. Miyasato's expectation of privacy in its contents. Thus, the mother's consent to search could not extend to the interior of his desk because of his reasonable expectation of privacy. Cf. O'Connor v. Ortega, 480 U.S. 709, 717-18, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (holding public employee has reasonable expectation of privacy in his desk); Bateman v. State, 513 So.2d 1101, 1103 (Fla. 2d DCA 1987) (reversing denial of motion to suppress cocaine found in public employee's desk drawer); United States v. Block, 590 F.2d 535 (4th Cir.1978) (holding evidence found in footlocker in son's room not admissible); Holzhey v. United States, 223 F.2d 823 (5th Cir.1955) (holding evidence found in cabinets not admissible); United States v. Blok, 188 F.2d 1019 (D.C.Cir. 1951) (holding evidence found in employee's desk not admissible); United States v. Butler, 495 F.Supp. 679 (E.D.Ark.1980) (holding evidence found in chest of drawers in son's room not admissible); State v. Pinegar, 583 S.W.2d 217 (Mo.Ct.App.1979) (holding evidence found in footlocker in son's room not admissible).
We caution that the adult child in this case was well beyond the age of majority and had established his own family unit, albeit a nontraditional one. In many respects, it is difficult to distinguish his bedroom from the type of independent living quarters that a family may provide for an older family member. If Mr. Miyasato had been an eighteen-year-old high school student who had not yet established independence from his family, the result might be different. We do not have to decide that question today.
Accordingly, we reverse the denial of Mr. Miyasato's motion to suppress the contraband the deputies found in his desk drawer.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
NORTHCUTT and CASANUEVA, JJ., concur.

ORDER ON MOTION TO STAY OR WITHDRAW MANDATE
ALTENBERND, Acting Chief Judge.
The State has filed a motion asking this court to stay the issuance of the mandate in this case while the State seeks further review in the Supreme Court of Florida. Although the State filed its motion to stay mandate more than fifteen days after this court denied the State's motion for rehearing, we grant the motion. We hold that the issuance of mandate in this case was not a ministerial act, and therefore this court has the discretion to withhold issuance of its mandate while the State seeks further review.
On March 7, 2001, this court issued an opinion in this case reversing the trial court's denial of a motion to suppress evidence. State v. Miyasato, 805 So.2d 818 (Fla. 2d DCA 2001). In pertinent part, this court held that the State had not established that Mr. Miyasato's mother had actual or apparent authority to consent to the search of her adult son's personal desk in his bedroom in her home, particularly when the adult son was present and available to give his consent. On May 21, 2001, this court denied the State's motion for rehearing. This court had the authority to issue mandate on June 6, 2001, fifteen days after the denial of rehearing. *823 See Fla. R.App. P. 9.340(b). We did not do so. No judge of this court internally ordered the clerk to stay mandate at any time prior to June 6, 2001.
On June 13, 2001, the State filed a motion to stay or recall our mandate in conjunction with its notice to invoke the supreme court's discretionary jurisdiction. The State asks this court to stay the issuance of the mandate because it is seeking review of the opinion in the Supreme Court of Florida and further proceedings in the trial court might render any further review moot. It is noteworthy that our opinion addresses Fourth Amendment issues that could also be reviewed by the United States Supreme Court even if the Supreme Court of Florida declined to review the case. See 28 U.S.C. § 1257(a).
As of the date the State filed its motion to stay mandate, this court had not issued its mandate. The three-judge panel ordered the clerk to stay the issuance of mandate during the pendency of this motion and ordered Mr. Miyasato to respond to the motion. Mr. Miyasato responded, arguing that the issuance of the mandate on June 6, 2001, was a ministerial duty that this court was compelled to perform. See State ex rel. Price v. McCord, 380 So.2d 1037 (Fla.1980). We disagree. We hold that McCord applies only to those cases involving a final judgment for money damages that grants the prevailing party a vested right. In other cases not affecting such fixed, vested rights, the district court has discretion to withhold or withdraw its mandate while a party actively seeks further review.

STATE EX REL. PRICE V. MCCORD
McCord was a civil case involving a money judgment. At trial, the plaintiff obtained a money judgment for personal injuries. After the First District affirmed the plaintiff's judgment, the defendants sought further review but did not file a motion to stay mandate within the fifteen days between the court's decision to deny rehearing and the issuance of the mandate. Nevertheless, the First District set aside its mandate and denied the plaintiff's motion to issue a new mandate. The plaintiff filed a petition for writ of mandamus in the supreme court to compel the First District to issue its mandate. The supreme court granted the writ, stating in part:
In the present case, appellants did not move for a stay of mandate, nor did the court enter a stay on its own motion within the fifteen-day period. Under these circumstances, rule 9.340 makes the issuance of mandate a ministerial duty after the fifteen-day period has expired. That duty, of course, may properly be compelled by writ of mandamus.
380 So.2d at 1038.
This court agrees that it has a ministerial duty to issue mandate on a money judgment upon expiration of the time frames described in rule 9.340. Although our internal practices have varied over the years, at the present time we take reasonable steps to issue mandate in such cases upon expiration of the fifteen-day period. On the other hand, this court has not complied with McCord in criminal cases or in some civil cases involving matters other than money judgments. For example, in criminal cases, we do not typically issue mandate until at least twenty-one days have elapsed because the mail box rule[1] affects many criminal cases. We write this opinion to explain that the Second District does not regard McCord as controlling precedent in cases other than civil cases involving final money judgments.

*824 PURPOSE AND PRACTICAL EFFECT OF MANDATE
In general, the mandate in any case functions to end the jurisdiction of the appellate court and to return full jurisdiction of the case to the trial court. If a stay has been entered under Florida Rule of Appellate Procedure 9.310, the mandate typically causes the stay to end. See rule 9.310(e). The specific function and effect of a mandate differs significantly, however, depending upon whether the case is a civil case or a criminal case, and whether the appeal is one of a final order or of a nonfinal order.
When a defendant in a civil case appeals a final monetary judgment and posts a bond, the defendant must wait to collect the judgment until mandate issues. If we affirm such a judgment, there is little reason to delay the plaintiff's right to collect the judgment by withholding the mandate. When a plaintiff appeals a defense judgment, the situation is similar except that the only judgment to be collected on remand is often a cost judgment in favor of the defendant. In these cases, the party has a strong, vested right awaiting the mandate for enforcement. In other cases, however, the practical function and effect of the mandate requires that the district court have more discretion and flexibility regarding the issuance of the mandate.
For example, when either party in a civil case appeals a nonfinal order, that party has no vested right to collect or enforce a judgment. The trial court proceeding is not automatically stayed, and the parties can continue, with some exceptions, to litigate in the trial court. Our mandate in such a case merely returns full jurisdiction to the trial court. In such a case, this court should have discretion to stay or delay issuance of a mandate.
In criminal cases, other considerations apply. When the defendant appeals a judgment and sentence, the need for timely issuance of a mandate depends upon the specific facts of the case. If the defendant's sentence has commenced and we affirm the judgment and sentence, the issuance of our mandate has no practical effect. In the rare case where the defendant's sentence has been stayed pending appeal and this court affirms the sentence, the State may have an interest in obtaining a mandate at the earliest available time in order for the defendant's sentence to commence. If we reverse the judgment and sentence, the case returns to the trial court for further proceedings consistent with the opinion. If we order an acquittal and the defendant is currently in prison, the defendant has a greater interest in a rapid issuance of mandate because it is required to obtain release from prison, but the State may still have valid reasons to obtain a stay pending review in the supreme court. If the reversal results in a new trial, the defendant and State probably have less need for an immediate mandate.
Because of double jeopardy, the State cannot appeal final judgments in favor of defendants entered after a trial. Thus, the State generally appeals nonfinal orders or dismissals that occur prior to the attachment of jeopardy. See Fla. R.App. P. 9.140(c)(1). If we affirm an order of dismissal, our issuance of mandate has little practical effect. If we affirm a nonfinal order suppressing evidence, like we did in this case, on remand the case will either be dismissed or tried without the disputed evidence. A trial without disputed evidence could result in a jury verdict adverse to the State and a double jeopardy bar to further appeal.
The foregoing general discussion demonstrates that a final money judgment is the only common circumstance in which a party has a strong vested right that awaits *825 the mandate for enforcement. In other cases, the status of the parties, the result of the opinion, and the effect that opinion will have on the parties require that the appellate court have greater discretion and flexibility in deciding when to issue its mandate.
We recognize that rule 9.340 can be read as creating a ministerial duty on the part of our clerk to issue mandate in all cases at the earliest possible moment absent a case-specific order from the judges of this court directing the clerk to withhold the mandate. We note that, although motions to stay issuance of mandate are common, there is no rule of procedure authorizing this motion. It is most frequently used in cases in which no stay under rule 9.310 has been entered, but the appeal itself has effectively stayed proceedings below. If this court and its clerk have no discretion concerning the issuance of mandate, presumably we would need to receive and rule upon any motion to stay the issuance of a mandate prior to the expiration of the fifteen-day period in order to avoid the mandatory issuance of mandate. As a practical matter, it is unrealistic to place a burden upon this court to review each case prior to the issuance of a mandate and issue orders in the hours preceding the expiration of the fifteen-day period if it wishes to extend its jurisdiction over a handful of the more than 5000 cases it resolves in any given year.
In addition, such an interpretation seems inconsistent with other discretionary authority this court has over its mandates. Although this case involves the decision to stay issuance of mandate, appellate courts have the authority to withdraw their mandates and reassert jurisdiction to reconsider their opinions within a term of court. Judges of the Eleventh Judicial Circuit v. Janovitz, 635 So.2d 19 (Fla.1994); Chapman v. St. Stephens Protestant Episcopal Church, 105 Fla. 683, 138 So. 630 (1932). Indeed, the district courts of appeal regularly do so. See, e.g., Golz v. State, 722 So.2d 210 (Fla. 2d DCA 1998); Francilien v. State, 782 So.2d 1008 (Fla. 4th DCA 2001); Jones v. State, 773 So.2d 107 (Fla. 5th DCA 2000). The courts possess this power, even though there is no rule of procedure governing this process. It is difficult to believe that appellate courts would have a ministerial duty to issue all mandates on a specific date if they have discretion immediately thereafter to withdraw the mandate.

FACTORS TO BE WEIGHED IN DETERMINING WHETHER TO STAY MANDATE
Because we conclude that we have discretion to determine whether to issue the mandate in this case while the State seeks further review of our opinion, we must address what factors should be reviewed in making such a decision. The McCord decision suggests that a district court can withhold mandate after considering several factors derived from the comments to Florida Rule of Appellate Procedure 9.120. These factors include (1) the likelihood that jurisdiction will be accepted by the supreme court, (2) the likelihood that the movant will prevail on the merits in the supreme court, (3) the likelihood of harm if the stay is not granted, and (4) the likelihood that the harm would be irreparable in the absence of the stay. The Fourth District recently applied these factors in a published order denying a stay of the mandate. Oliveira v. State, 765 So.2d 90 (Fla. 4th DCA 2000). We also conclude that because we could consider similar factors to withdraw our mandate, we should also consider these factors in deciding whether to stay our unissued mandate in *826 this criminal case.[2]
In this case, the likelihood that the supreme court will accept jurisdiction is difficult to gauge. Obviously, this panel of judgeshaving ruled against the Stateis not in the most objective posture to measure this factor. Although the State's motion is not overly persuasive on this issue, it points out that there are numerous Fourth Amendment cases in this state and a conflict may exist between this decision and one of those decisions.
Assuming the supreme court grants jurisdiction, we accept the proposition that the State has arguments that it can present in good faith. As our opinion reflects, there is precedent from other jurisdictions that would support the State's position.[3] However, the likelihood of the State's success in the supreme court is unclear.
The harm to Mr. Miyasato arising from a stay appears minimal. Mr. Miyasato is not incarcerated. He has not invoked his right to speedy trial. He has not claimed that a stay would cause any special harm to him. The order appealed is a pretrial order. At worst, a stay allows a criminal proceeding to remain pending and unresolved for a few months. A stay may prevent Mr. Miyasato from attempting to take steps to invoke double jeopardy and, thus, protect our favorable decision from review by a higher court. Thus, if anything, there is a risk that the denial of the stay might cause irreparable damage to the State.
Balancing these factors together, although we believe the State's chances of victory are small, the harm to Mr. Miyasato caused by a stay is minimal and the risks to the State if no stay is granted are significant. We would be hard pressed to rule that a stay is "essential" in this case, if that is truly the test. See Fla. R.App. P. 9.120 committee notes. We are not convinced that the balance must weigh so heavily in favor of the State in this type of appellate proceeding. Given the absence of any real harm to Mr. Miyasato, we grant the stay.
NORTHCUTT and CASANUEVA, JJ., Concur.
NOTES
[1] Although a defendant may not file an interlocutory appeal from an order denying suppression, a cross-appeal is permitted under these circumstances. Lopez v. State, 638 So.2d 931, 932-33 (Fla.1994).
[2] See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] At least in dicta, a number of courts have suggested that the presence of an adult child on the premises limits a parent's authority to consent to a search of the adult child's personal area or effects. Cf. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (holding that consent of person with common authority over area or effects to be searched is valid where defendant with whom authority is shared is absent); Preston v. State, 444 So.2d 939 (Fla. 1984), sentence vacated on other grounds, 564 So.2d 120 (Fla.1990) (holding mother who cleaned son's room had sufficient access to and control of his general bedroom area and open garbage can to validly consent to search where son was absent); Carter v. State, 762 So.2d 1024 (Fla. 3d DCA 2000) (explaining that parents had sufficient access to and control of son's bedroom to have given valid consent to search if son had been absent, but parents' consent alone would have been insufficient because son was present; upholding conviction because son consented and failed to withdraw his consent); Leonard v. State, 659 So.2d 1210 (Fla. 4th DCA 1995) (holding grandmother who did grandson's laundry and cleaned his room had sufficient access and control to authorize general search of his room where grandson was absent).
[1] See Haag v. State, 591 So.2d 614 (Fla.1992).
[2] The burden of persuasion in this context must be placed on the movant. Many motions to stay issuance of a mandate recite these grounds without any factual elaboration. Often this court has insufficient information available to it to determine whether irreparable harm could result in the absence of a stay. The State frequently asserts a double jeopardy risk when the basis for that claim is unclear or doubtful. This court often denies motions when the State fails to present sufficient information to support its assertions.
[3] We frankly are uncertain what, if any, consideration we should give to the possibility that the United States Supreme Court could review this case even if the Supreme Court of Florida declined review.